IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**WALTER RODRIGUEZ,**                          :
                                              :
        **Plaintiff**                          :        **CIVIL NO. 1:CV-12-02090**
                                              :
**v.**                                         :        **(Judge Rambo)**
                                              :
**WARDEN J.E. THOMAS,** *et al.*,              :
                                              :
        **Defendants**                         :

## M E M O R A N D U M

Plaintiff Walter Rodriguez, a federal inmate formerly incarcerated at the

United States Penitentiary in Lewisburg, Pennsylvania ("USP-Lewisburg"),

initiated this action against several Bureau of Prisons ("BOP") officials[1] with a

*Bivens*[2]-styled complaint filed on October 18, 2012, as amended on July 9, 2014.

(Doc. 105.)  In the amended complaint, Plaintiff claims that his constitutional

rights were violated in connection with a physical and verbal assault by Defendant

PA Potter and subsequent medical care; that several Defendants subsequently

retaliated against him after it was discovered that he wished to pursue legal action

---

[1] Named as Defendants are USP-Lewisburg Warden J.E. Thomas, Physician Assistant
("PA") Leonard Potter, PA Douglas McClintock, Lieutenant Daniel Knapp, Lieutenant Hult,
Correctional Officer ("CO") David Eichner, CO Ty Crawley, and Special Investigative Service
Agent ("SIS") James Fosnot.

[2] *Bivens* actions are the federal counterpart to § 1983 claims brought against state
officials.  *Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004) (citing *Brown v. Philip
Morris, Inc.*, 250 F.3d 789, 800 (3d Cir. 2001)).  "[C]ourts have generally relied upon the
principles developed in the case law applying section 1983 to establish the outer perimeters
of a *Bivens* claim against federal officials."  *Schrob v. Catterson*, 948 F.2d 1402, 1409 (3d Cir.
1991).

against Defendants; and, that he was subjected to atypical and significant hardship in connection with the conditions of confinement in his restricted confinement cell.  Plaintiff seeks compensatory and declaratory relief.

Presently before the court are two motions to dismiss, filed by Defendant PA Potter (Doc. 107) and Defendants Eichner, Thomas, Crawley, McClintock, Knapp, and Fosnot ("BOP Defendants") (Doc. 129).[3]  For the reasons set forth below, the motions will be granted in part and denied in part.

## I.   **Background**

### A.   **Facts**

In the amended complaint, Plaintiff provides the following factual background with respect to his claims.  For purposes of disposition of the instant motions to dismiss, the factual allegations asserted in the amended complaint will

---

[3] In their brief in support of the motion to dismiss, BOP Defendants state that they are "simultaneously" filing an alternative motion for summary judgment.  (*See* Doc. 130 at 11.) However, in the motion the standard for summary judgment is not set forth, nor do Defendants make any argument that there is no genuine issue to be tried.  Rather, the brief in support of their motion argues only that Plaintiff has failed to make sufficient allegations, purportedly in support of their motion to dismiss the amended complaint and not in support of an argument in favor of summary judgment.  (*See generally* Doc. 130.)  In addition, BOP Defendants have not filed an accompanying statement of material facts.  *See* L.R. 56.1 ("A motion for summary judgment filed pursuant to Fed. R. Civ. P. 56, shall be accompanied by a separate, short and concise statement of material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.").  As a result, the court will not treat BOP Defendants' motion to dismiss (Doc. 129) as, in the alternative, a motion for summary judgment.

be accepted as true and viewed in a light most favorable to Plaintiff.  In addition, all the events in the amended complaint appear to have occurred at various security level facilities at Plaintiff's former place of confinement, USP-Lewisburg.

Plaintiff asserts that he is a chronic care inmate suffering from chronic diabetes and "other chronic ailments." (Doc. 105 ¶ 71.)  Plaintiff requires insulin and monitoring to treat his diabetes. (*Id*.)

On August 11, 2012, approximately between 9:15 and 9:30 p.m., while located at a unit at the Federal Prison Camp in Lewisburg, Plaintiff started to feel sick, lightheaded, nauseous, dizzy, weak, and disoriented. (*Id*. ¶ 14.)  He thought he was going to faint.  (*Id*.)  As a result, he approached CO Ross[4] at the Office Station and asked him to call the paramedics.  (*Id*. ¶ 15.)  CO Ross opened the medical room for Plaintiff and allowed him to check his blood sugar level with a glucometer.  (*Id*.)  The blood sugar level read "high," or over 500.  (*Id*.)  Plaintiff asserts that the normal range is between 90 and 110.  (*Id*.)

CO Ross called Defendant PA Potter, who was located at the Lewisburg Penitentiary at the time, to inform him of Plaintiff's condition.  (*Id*. ¶ 16.)  According to Plaintiff, PA Potter "showed reluctance" to travel to Plaintiff at the Camp, and instead instructed Plaintiff to drink water and return to bed.  (*Id*.)

---

[4] CO Ross is not a Defendant in this action.

3

Plaintiff then returned to his unit.  (*Id*.)

Later, when CO Ross and Defendant CO Eichner came to the unit to perform the inmate count, CO Ross called in a "medical emergency" for Plaintiff. (*Id*. ¶ 17.)  Two inmates assisted Plaintiff to the medical room at the Camp's Administration Building, where Plaintiff laid down on a medical bed.  (*Id*.)  CO Eichner remained in the room with Plaintiff until PA Potter and Defendant Lieutenant Knapp arrived.  (*Id*.)  Fifteen (15) minutes after CO Ross called in the "medical emergency", and approximately twenty-five (25) minutes after Plaintiff first notified CO Ross about his condition, PA Potter and Lieutenant Knapp arrived at the medical room.  (*Id*.)

Upon arriving at the medical room, PA Potter yelled, "What the f*** am I here for?  What the f*** you expect me to do?"  (*Id*. ¶ 18.)  Plaintiff responded, "help me."  (*Id*.)  PA Potter then asked Plaintiff to extend his left arm in order to "finger stick" him.  (*Id*. ¶ 19.)  After he did this, PA Potter grabbed Plaintiff's wrist and threw his arm back aggressively.  (*Id*.)  PA Potter then prepared a syringe and injected Plaintiff "with force," causing Plaintiff pain.  (*Id*. ¶ 20.)  PA Potter then grabbed Plaintiff by his shirt and pulled him to a sitting position.  (*Id*.)  Plaintiff asserts that he feared for his safety and physical well-being and believed PA Potter would strike him.  (*Id*. ¶ 21.)  When Plaintiff stood up, PA Potter struck

4

him on the back of his neck and shoved him forward, causing Plaintiff further

pain. (*Id*. ¶ 22.)  PA Potter then cursed at Plaintiff, "Get the f**k out of my

office," and pushed Plaintiff out of the room. (*Id*. ¶ 23.)

After he left the office and was staggering down the hallway, Plaintiff heard

PA Potter asking CO Eichner, "Where did he go?  Where did he go?" (*Id*. ¶ 24.)

PA Potter then threw a sandwich at Plaintiff that struck him on his back as he

walked down the hallway. (*Id*. ¶ 25.)  CO Eichner and Lieutenant Knapp

witnessed these events and did not intervene at any point. (*Id*. ¶ 26.)  Plaintiff also

avers that PA Potter never monitored or followed up with Plaintiff's condition

after treatment. (*Id*. ¶ 27.)

After this incident, on the same night between approximately 9:50 p.m. and

10:05 p.m., Plaintiff called his brother, Pablo Rodriguez, to tell him about the

incident with PA Potter and ask that he search for an attorney for legal advice. (*Id*.

¶ 30.)  Plaintiff also told his brother that he planned to write everything down in

detail and mail the account to him for use by an attorney. (*Id*.)  Plaintiff avers that

it is BOP policy to monitor and record telephone calls. (*Id*.)

The next morning, August 12, 2012, Plaintiff went to the medical

department to get his insulin shot and notified the PA on duty that he was having

pain in the back of his neck. (*Id*. ¶ 31.)  Plaintiff asked for painkillers, but was

told to buy aspirin from commissary instead.  (*Id*.)  He was not further treated for his neck pain.  (*Id*.)  Plaintiff saw CO Wagner at his cell when he returned from medical and told her about his distress over his condition.  (*Id*.)

On August 13, 2012, at 3:55 p.m., Plaintiff went to see the facility's psychologist, Dr. Banks, to seek help for the depression and emotional distress he was suffering as a result of the incident with PA Potter.  (*Id*. ¶ 31.)  Plaintiff avers that he was still in shock and was suffering from nightmares and panic attacks. (*Id*.)

Two days after Plaintiff placed the telephone call to his brother, on August 14, 2012, at approximately 8:00 a.m., a correctional officer arrived at Plaintiff's prison workplace, Unicor Recycling, and detained him.  (*Id*. ¶ 32.)  Plaintiff was separated from general population and placed in administrative detention in a restricted housing unit at USP-Lewisburg, also known as the SHU.  (*Id*.)  Plaintiff avers that Defendant SIS Agent Fosnot made this decision and specifically placed Plaintiff in "G" block, which holds gang members and violent inmates.  (*Id*.) Plaintiff further asserts that he was "distressed" about the move to the SHU because he knew PA Potter worked there.  (*Id*. ¶ 34.)

Once Plaintiff arrived at the SHU, he was placed in a temporary cell and interviewed by Agent Fosnot and a psychologist.  (*Id*. ¶ 35.)  Plaintiff told them

about the incident with PA Potter and about his health issues.  (*Id.*)  At the end of

the interview, Agent Fosnot told Plaintiff, "it sucks to be you now."  (*Id.*)  Plaintiff

was then placed in an SHU cell.  (*Id.*)

On August 18, 2012, Defendant PA McClintock approached Plaintiff in the

SHU and told him that Plaintiff would be staying in the SHU program for eighteen

(18) months.  (*Id.* ¶ 36.)  Before walking away, PA McClintock laughed and said,

"Potter will see you soon."  (*Id.*)  Further, each time PA McClintock came to

Plaintiff's SHU cell to administer Plaintiff's insulin and other medication,[5] he told

Plaintiff, "this is your new home for the next 18 months."  (*Id.* ¶ 38.)  Plaintiff

asserts that, because he did not trust PA McClintock with his medication and

feared harm, he refused to take his medication.  (*Id.* ¶ 39.)  However, on

approximately four (4) occasions, Plaintiff took insulin and other medication from

a correctional officer he did not recognize.  (*Id.* ¶ 40.)  A PA was present on these

occasions, and Plaintiff eventually discovered that the PA was PA Potter.  (*Id.*)

This discovery caused distress for Plaintiff, including extreme headaches.  (*Id.* ¶

42.)

On September 12, 2012, at approximately 7:00 p.m., PA Potter called

---

[5] Plaintiff avers that PA McClintock came to his SHU cell to administer medication on
the following dates in 2012: September 28, 29; October 9, 12-14, 27, 28, 31; and, November 4.
(Doc. 105 ¶ 38.)

Plaintiff a "dumb a\*\*." (*Id*. ¶ 43.)  In addition, Plaintiff discovered that PA Potter was preparing his insulin and other medication.[6] (*Id*.)  Because Plaintiff feared for his life, when PA Potter would give him the insulin syringe, Plaintiff would pretend to inject himself with it, but instead would empty it into the air.  (*Id*.)  He also kept his pills under his tongue in order to spit them out later.  (*Id*.)

On September 16, 2012, Plaintiff wrote complaints to Defendants Lieutenant Hult and Warden Thomas, expressing his concerns over being approached by PA Potter, but these complaints were ignored.  (*Id*. ¶ 45.)

On September 27, 2012, after PA McClintock heard that Plaintiff was suing him, he threatened Plaintiff with a "you wanna play games" statement.[6] (*Id*. ¶ 37.) The following morning, Plaintiff asked Defendant CO Crawley to turn off the light in his SHU cell because he had headaches and could not sleep.  (*Id*. ¶ 48.)  CO Crawley responded, "suck it up, and next time don't come to the SHU," and refused to turn off the light.  (*Id*.)  He also denied Plaintiff a shower.  (*Id*.)  On October 3, 2012, CO Crawley again denied Plaintiff a shower.  (*Id*. ¶ 50.)

---

[6] Plaintiff avers that PA Potter came to his SHU cell to administer medication on the following dates in 2012: September 17, 21, 23, 26; October 1, 2, 5-7, 11, 21, 23-25; and, November 8.  (Doc. 105 ¶ 46.)  Every time PA Potter came to Plaintiff's cell he called him an "a\*\*hole." (*Id*. ¶ 47.)

[6] The court is unsure of what a "you wanna play games" statement is and Plaintiff has provided no further information as to the context of such a statement.

On October 20, 2012, Plaintiff told a psychologist at his SHU cell that he could not sleep due to the bright lights being on all day and night, and that he was having constant headaches and severe depression.  (*Id.* ¶ 49.)

On October 23, 2012, after seventy (70) days of confinement in the SHU, Agent Fosnot came to Plaintiff's cell to take a statement and told Plaintiff, "You shouldn't be here."  (*Id.* ¶ 51.)  Two days later, on October 25, 2012, Plaintiff was taken to an outsider doctor's appointment, but the correctional officer escorting him teased him, saying, "watch it, watch it, here comes PA Potter," and, "it is a good thing we don't have cameras in this area."  (*Id.* ¶ 52.)  The CO also told Plaintiff, "If you were at the Camp you would not have to put up with being handcuffed and shackled."  (*Id.* ¶ 53.)

On November 15, 2012, Agent Fosnot transferred Plaintiff to USP-Allenwood's SHU without informing Plaintiff of the SIS investigation findings. (*Id.* ¶ 55.)  Plaintiff remained in restricted confinement, segregated from general population.  (*Id.* ¶ 61.)  Subsequently, on January 22, 2013, Plaintiff was transferred to FCI-Schuylkill's Medium Facility SHU, where he remained in restricted confinement and segregated from general population.  (*Id.* ¶ 62.)  Once there, Plaintiff was evaluated by a psychologist and he told her about his previous SHU confinement.  (*Id.* ¶ 63.)  Thereafter, on January 25, 2013, Plaintiff was

released to the FCI-Schuylkill's Camp general population.  (*Id*. ¶ 64.)

In addition to providing the aforementioned chronological background with respect to his confinement in the SHU, Plaintiff also asserts the following facts with respect to the conditions of his confinement there.  While confined in USP-Lewisburg's SHU, Plaintiff was locked down 24/7, with two cell mates in a six (6) by nine (9) foot cell.  (*Id*. ¶ 57.)  The cell always held three (3) inmates, despite availability in other cells.  (*Id*. ¶ 58.)  Plaintiff was provided with no recreation, nor was he permitted to go to the law library.  (*Id*. ¶ 57.)

Plaintiff and his cell mates were never provided with a mop or broom to clean the cell, and paint was peeling from the ceiling.  (*Id*. ¶ 59.)  The cell's toilet would clog with fecal matter and toilet paper for days.  (*Id*.)  In addition, the cell was infested with cockroaches and mice.  (*Id*.)  It was also extremely hot, causing Plaintiff to feel thirsty and dehydrated.  (*Id*.)  Any complaints about the cell to correctional officers went unanswered.  (*Id*.)

Apart from these conditions, Plaintiff also was traumatized and shocked by other events in the SHU, such as hearing of another inmate who tried to hang himself in an adjacent cell, hearing correctional officers make racist remarks, and witnessing a correctional officer pepper spray another inmate.  (*Id*. ¶ 60.)

Overall, Plaintiff asserts that he was subjected to a total of 165 days in

restricted confinement, segregated from general population, in retaliation for what

prison officials overheard in Plaintiff's telephone conversation with his brother

following the incident with PA Potter and for "denouncing the physical and verbal

assault inflicted to him by PA Potter." (*Id*. ¶ 65.)  He further asserts that, prior to

being placed in restricted confinement, he had a job with Unicor Industries, was

participating in institutional educational programs, was regularly attending

religious services, and was taking college correspondence classes.  (*Id*. ¶ 66.)

These activities, as well as his general support network, were interrupted by his

retaliatory restrictive confinement.  (*Id*.)

> ### B.   <u>Procedural History</u>

Plaintiff initiated this civil action with a complaint filed on October 18,

2012.  (Doc. 1.)  However, by order dated May 13, 2014, the court granted

Plaintiff's motion for leave to file an amended complaint.  (Doc. 95.)  The

amended complaint was filed on July 9, 2014.  (Doc. 105.)  Defendant PA Potter

filed a motion to dismiss on July 22, 2014, (Doc. 107), and BOP Defendants filed

a motion to dismiss on August 14, 2014, (Doc. 129).  Responsive and reply

briefings have been filed.  Thus, the motions to dismiss (Docs. 107 & 129) are ripe

for disposition.

## II.    **Standard of Review**

Among other requirements, a sound complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  This statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "Fair notice" in the context of Rule 8(a)(2) "depends on the type of case – some complaints will require at least some factual allegations to make out a showing that the pleader is entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (quotation omitted).  "[A] situation may arise where, at some point, the factual detail in a complaint is so undeveloped that it does not provide a defendant the type of notice of claim which is contemplated by Rule 8." *Id*.  A plaintiff must provide more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" to show entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555) (recognizing that Rule 8 pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"); *accord*, *e.g.*, *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (stating that the court is not "compelled to accept unsupported

12

conclusions and unwarranted inferences or a legal conclusion couched as a factual allegation.") (quotations and citations omitted).

A defendant may attack a complaint by a motion under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  In deciding a motion to dismiss under Rule 12(b)(6), the court is required to accept as true all of the factual allegations in the complaint, *Erickson v. Pardus*, 551 U.S. 89, 93 (2007), and all reasonable inferences permitted by the factual allegations, *Watson v. Abington Twp.*, 478 F.3d 144, 150 (3d Cir. 2007), and view them in the light most favorable to the plaintiff, *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007).  If the facts alleged are sufficient to "raise a right to relief above the speculative level" such that the plaintiff's claim is "plausible on its face," a complaint will survive a motion to dismiss.  *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 555, 570) (explaining a claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"); *see also Phillips*, 515 F.3d at 234; *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007); *Stevenson v. Carroll*, 495 F.3d 62, 66 (3d Cir. 2007).  Further, when a complaint contains well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at

13

664. However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id*. at 678 (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id*.

"To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted); *see also Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007).  The court may consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] document[s]." *Pension Benefit*, 998 F.2d at 1196.  Additionally, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) (citation omitted); *see also U.S. Express Lines, Ltd. v Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) ("Although a district court may not consider matters extraneous to the pleadings, a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one

14

for summary judgment." (internal quotation omitted)).  However, the court may

not rely on other parts of the record in making its decision.  *Jordan v. Fox,*

*Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).

When presented with a *pro se* complaint, the court should construe the

complaint liberally and draw fair inferences from what is not alleged as well as

from what is alleged.  *Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003);

*Youse v. Carlucci*, 867 F. Supp. 317, 318 (E.D. Pa. 1994).  Such a complaint "must

be held to less stringent standards than formal pleadings drafted by lawyers."

*Erickson*,551 U.S. at 94 (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

Finally, in the Third Circuit, a court must grant leave to amend before

dismissing a civil rights complaint that is merely deficient.  *See, e.g.*, *Fletcher-*

*Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir.

2007); *Weston v. Pennsylvania*, 251 F.3d 420, 428 (3d Cir. 2001); *Shane v.*

*Fauver*, 213 F.3d 113, 116 (3d Cir. 2000).  "Dismissal without leave to amend is

justified only on the grounds of bad faith, undue delay, prejudice, or futility."

*Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004).

## III.   Discussion

In their motions to dismiss, both PA Potter and BOP Defendants argue that

15

the amended complaint should be dismissed on the following grounds: (1) Plaintiff has failed to state a claim related to the Eighth Amendment right to adequate medical care; and (2) Plaintiff has failed to state a claim of retaliation under the First Amendment.  In addition, BOP Defendants argue that Plaintiff has failed to exhaust his administrative remedies with respect to the allegations in the amended complaint.  As exhaustion is a threshold issue, the court will first discuss exhaustion of administrative remedies before proceeding to the other arguments set forth by both sets of Defendants.

### A.   <u>Exhaustion of Administrative Remedies</u>

The Prison Litigation Reform Act of 1995 ("PLRA"), as amended at 42 U.S.C. § 1997e, requires prisoners to present their claims through an administrative grievance process before seeking redress in federal court.  The PLRA specifically provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  A prisoner must comply with the PLRA exhaustion requirement as to any claim that arises in the prison setting, regardless of the nature of the claim or of the relief sought.  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 741 n.6

16

(2001).  "[I]t is beyond the power . . . of any . . . [court] to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis." *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000).  Failure to exhaust administrative remedies is an affirmative defense that must be pled and proven by the defendant.  *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002) (reasoning that "[p]rison officials are likely to have greater legal expertise and, as important, superior access to prison administrative records in comparison to prisoners").

Further, the PLRA mandates that a prisoner "properly" exhaust administrative remedies before filing suit in federal court, which demands compliance with an agency's deadlines and other procedural rules.  *Woodford v. Ngo*, 548 U.S. 81, 92 (2006); *Spruill v. Gillis*, 372 F.3d 218, 230 (3d Cir. 2004) (concluding that the PLRA includes a procedural default component); *Rivera v. Pa. Dep't of Corr.*, 388 F. App'x 107, 108 (3d Cir. 2010) ("An inmate must exhaust his administrative remedies *prior* to filing a civil action in federal court.") (emphasis added).  A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim.  *McKinney v. Kelchner*, Civ. No. 1:CV-05-0205, 2007 WL 2852373, at *3 (M.D. Pa. Sept. 27, 2007) (citing *Spruill*, 372 F.3d at 227-32; *Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000)).

17

The BOP has established an Administrative Remedy Procedure through which a prisoner may seek formal review of a complaint which relates to any aspect of his imprisonment if less formal procedures have not resolved the matter. 28 C.F.R. §§ 542 *et seq*. This procedure applies to all inmates confined in BOP institutions. 28 C.F.R. § 542.10. Inmates are to informally present their complaints to the staff and the staff must attempt to resolve the matter. *Id*. at § 542.13(a). If informal resolution is unsuccessful, the inmate must then execute the appropriate form to bring the matter to the attention of the warden. *Id*. at § 542.14(b). The warden must then respond to the inmate's complaint within twenty (20) days. *Id*. at 542.18. If an inmate is dissatisfied with the warden's response, he may then appeal to the Regional Director. *Id*. at § 542.15. If the response of the Regional Director is not satisfactory, the inmate may then appeal to the Central Office of the BOP, which is the final administrative appeal in the BOP. *Id*. No administrative appeal is considered finally exhausted until a decision is reached on the merits by the BOP's Central Office. *Id*. at § 542.15.

In the instant case, Plaintiff alleges the following with respect to exhaustion of administrative remedies:

> The Administrative remedy process was not made available to Rodriguez when it was requested. Rodriguez tried to initiate the process by writing letters (*see* letters Exhibit 1), inwhich [sic] was

18

> given to the correctional officers to be delivered through the internal
> mail system while Rodriguez was in the SHU.  These letters were
> either destroyed, withheld, or not sent (*see* Affidavit Exhibit A).  It
> was stated in the letter, that Rodriguez was not able to get the
> Remedy Form (*see* Letter Exhibit B).

(Doc. 105 ¶ 68.)  In their motion to dismiss, BOP Defendants argue that not only

has Plaintiff failed to obtain a complete denial of an administrative claim

regarding the allegations in his amended complaint, but he has failed to file any

related administrative remedy request whatsoever.  They further claim that

Plaintiff has not alleged, or proved, that he was misled or that there was some

extraordinary reason he was prevented from complying with the PLRA's

exhaustion requirements.  However, in his brief in opposition, Plaintiff again

argues that the administrative remedy process was not available to him because his

informal resolution attempts through the internal mail system were either

destroyed, withheld, or not sent.  (Doc. 164 at 3.)  He adds that he sent a request to

his counselor for a remedy form to initiate the remedy process, but he was never

provided with one.  (*Id*. at 4.)  He also requested the institution's handbook

containing the administrative remedy process, but was never provided with one.

(*Id*.)  BOP Defendants have not responded to these allegations made by Plaintiff.

Upon consideration, and under the circumstances presented here at this

stage of litigation, Plaintiff has sufficiently demonstrated that the administrative

remedy process was not available to him, and thus exhaustion will be excused.

BOP Defendants' motion to dismiss will be denied as to this issue.

### B.    Eighth Amendment Deliberate Indifference Claim

In their motions to dismiss, both sets of Defendants argue that Plaintiff has

failed to establish a claim of deliberate indifference to his serious medical needs.[7]

A claim based on a violation of the Eighth Amendment's prohibition of

unnecessary and wanton infliction of pain arises where prison officials or doctors

exhibit deliberate indifference to serious medical needs of prisoners.  *Estelle v.*

*Gamble*, 429 U.S. 97, 104 (1976).  A deliberate indifference claim has two

components: an objective component under which the plaintiff must show that

denial of care itself was serious or that it had serious consequences; and a

subjective component under which the plaintiff must show that the defendant has a

---

[7] The inadequate medical care claim is asserted only against Defendants PA Potter and Knapp.  In one of his briefs in opposition to BOP Defendants' motion to dismiss, Plaintiff states that, "Rodriguez's claim is not about and has nothing to do with unadequate [sic] medical care, or the knowledge of the need for medical care of the defendants, or intentional refusal, or denial of medical care, or with the plaintiff's refusal at times of medication for fearing harm, or nothing in the nature of medical needs or adequate medical care while Rodriguez was detained in the SHU of Lewisburg USP." (Doc. 168 at 5.)  While it appears to be the case that Plaintiff is not asserting an Eighth Amendment inadequate medical care claim against BOP Defendants Eichner, Thomas, Crawley, McClintock, and Fosnot, from a reading of Plaintiff's amended complaint (Doc. 105) and his brief in opposition to Defendant Potter's motion to dismiss (Doc. 148), it does appear that he is asserting such a claim against Defendant PA Potter and BOP Defendant Knapp. (*See* Doc. 148 at 14-15) (articulating a deliberate indifference claim for inadequate medical treatment against Defendants PA Potter and Knapp).  As such, the court will discuss Plaintiff's Eighth Amendment claim related to medical care only with respect to Defendants PA Potter and Knapp, as Plaintiff is not asserting this claim against the other Defendants.

sufficiently culpable state of mind.  *See Montgomery v. Pinchak*, 294 F.3d 492,

499 (3d Cir. 2002).  Further, a serious medical need is "one that has been

diagnosed by a physician as requiring treatment or one that is so obvious that a lay

person would easily recognize the necessity for a doctor's attention." *Mines v.*

*Levi*, 2009 WL 8390011, at *7 (E.D. Pa. Mar. 26, 2009) (quoting *Colburn v.*

*Upper Darby Twp.*, 946 F.2d at 1017, 1023 (3d Cir. 1991)); *Monmouth Cty. Corr.*

*Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).  "[I]f unnecessary and

wanton infliction of pain results as a consequence of denial or delay in the

provision of adequate medical care, the medical need is of the serious nature

contemplated by the Eighth Amendment." *Young v. Kazmerski*, 226 F. App'x 191,

193 (3d Cir. 2008) (quoting *Lanzaro*, 834 F.2d at 347).

Deliberate indifference occurs where a defendant: (1) knows of a prisoner's

need for medical treatment but intentionally refuses to provide it; (2) delays

necessary medical treatment based on a non-medical reason; (3) prevents a

prisoner from receiving needed or recommended medical treatment; or (4) persists

in a particular course of treatment "in the face of resultant pain and risk of

permanent injury." *Rouse v. Allen*, 182 F.3d 192, 197 (3d Cir. 1999).  However,

"claims of negligence or medical malpractice, without some more culpable state of

mind, do not constitute 'deliberate indifference.'" *Id*. (citing *Estelle*, 429 U.S. at

105); *see also Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) (finding that if

inadequate treatment results simply from an error in medical judgment, there is no

constitutional violation); *Lanzaro*, 834 F.2d at 346 (stating mere disagreement as

to the proper medical treatment does not support an Eighth Amendment claim).  In

*Estelle*, the Supreme Court held the following:

> [A]n inadvertent failure to provide adequate medical care cannot be
> said to constitute "an unnecessary and wanton infliction of pain" or to
> be "repugnant to the conscience of mankind."  Thus, a complaint that
> a physician has been negligent in diagnosing or treating a medical
> condition does not state a valid claim of medical mistreatment under
> the Eighth Amendment.  Medical malpractice does not become a
> constitutional violation merely because the victim is a prisoner.

*Estelle*, 429 U.S. at 105-06.

It follows then that inconsistencies or differences in medical diagnoses,

short delays unaccompanied by arbitrary or unduly burdensome bureaucratic

procedures, and the refusal to summon the medical specialist of the inmate's

choice, perform tests or procedures that the inmate desires, or to explain to the

inmate the reason for medical action or inaction does not amount to cruel and

unusual punishment.  *Runkle v. Pa., Dep't of Corr.*, Civ. No. 13-137, 2013 WL

6485344, at * 8 (W.D. Pa. Dec. 10, 2013) (citing *Maqbool v. Univ. Hosp. of

Medicine & Dentistry of New Jersey*, Civ. No. 11-4592, 2012 WL 2374689, at * 9

(D. N.J. Jun. 13, 2012)).  As such, allegations that the inmate was provided with

medical care, but the care was "inadequate," fails to state a cognizable claim.

*Runkle*, 2013 WL 6485344, at *8 (citing *Taylor v. Visinsky*, 422 F. App'x 76, 78

(3d Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 406 (2011)).  *See also Jetter*

*v. Beard*, 130 F. App'x 523, 526 (3d Cir. 2005) (noting that while the plaintiff

would have preferred a different course of treatment, his preference does not

establish an Eighth Amendment cause of action).  Rather, "the decision whether to

summon a doctor, like the question of whether a certain diagnostic technique or

form of treatment should be prescribed, 'is a classic example of a matter for

medical judgment.'" *McNeil v. Redman*, 21 F. Supp. 2d 884, 887 (C.D. Ill. 1998)

(quoting *Estelle*, 429 U.S. at 107).   Accordingly, the deliberate indifference test

"affords considerable latitude to prison medical authorities in the diagnosis and

treatment of the medical problems of inmate patients.  Courts will 'disavow any

attempt to second guess the propriety or adequacy of a particular course of

treatment . . . which remains a question of sound professional judgment.'" *Little v.*

*Lycoming County*, 912 F. Supp. 809, 815 (M.D. Pa. 1996) (citing *Inmates of*

*Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979), quoting

*Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

Finally, in *Durmer*, the Third Circuit Court of Appeals added that a non-

physician defendant cannot be considered deliberately indifferent for failing to

respond to an inmate's medical complaints when he is already receiving treatment by the prison's medical staff. *Durmer*, 991 F.2d at 69. However, where a failure or delay in providing prescribed treatment is deliberate and motivated by non-medical factors, a constitutional claim may be presented. *See id*.

Turning first to the allegations against PA Potter, Plaintiff alleges that PA Potter was deliberately indifferent to his serious medical needs when he caused a fifteen (15) minute delay in treatment for Plaintiff's medical emergency involving his high blood sugar on August 11, 2012. (Doc. 105 ¶ 17.) Even though Plaintiff claims that PA Potter "showed reluctance" to travel to Plaintiff to treat his condition (*see id*. ¶ 16), the court cannot agree that a 15-minute delay supports a claim that PA Potter deliberately delayed or denied treatment to Plaintiff in violation of the Eighth Amendment. Nor does a 15-minute delay by PA Potter demonstrate that he was "knowingly and unreasonably disregarding an objectively intolerable risk of harm" to Plaintiff. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994). In fact, Plaintiff asserts that PA Potter did treat his condition that evening, and further treated him in the SHU. (*See id*. ¶¶ 19, 20, 43, 46.) Plaintiff has been provided with medication, but voluntarily has chosen to refuse it. (*Id*. ¶¶ 39, 43.) Without more, Plaintiff has failed to establish the subjective deliberate indifference component of this Eighth Amendment claim. Thus, PA Potter's

motion to dismiss Plaintiff's claim of deliberate indifference to his serious medical needs will be granted.  However, from a reading of the amended complaint, as well as Plaintiff's briefs in opposition to PA Potter's motion to dismiss, it is apparent that Plaintiff has also asserted an Eighth Amendment claim related to an excessive use of force by PA Potter on August 11, 2012.  As PA Potter has not addressed that claim in his motion to dismiss, the claim will proceed.

Next, as to Defendant Knapp, who is not a medical Defendant, it is well-established that, where a medical Defendant has not been found to be deliberately indifferent in his treatment of a plaintiff, the non-physician defendant cannot be liable.  *See Durmer*, 991 F.2d at 69.  Thus, this claim of deliberate indifference as to Plaintiff's medical needs will be dismissed as to Defendant Knapp.  However, again from a reading of the amended complaint, it is apparent that Plaintiff has also asserted a claim of failure to protect or failure to intervene against Defendant Knapp related to the August 11, 2012 incident involving PA Potter.  Because BOP Defendants have not addressed this claim in their motion to dismiss, Defendant Knapp will not be dismissed as a Defendant.

### C.    First Amendment Retaliation Claim

Retaliation for expressive activities can infringe upon an individual's rights under the First Amendment.  *See Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d

Cir. 2000). In the prison context, an individual's rights are lessened, but not extinguished, where legitimate penological interests must be considered in assessing the constitutionality of official conduct. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). To prevail on a retaliation claim under 42 U.S.C. § 1983, a plaintiff must demonstrate (1) that he was engaged in protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him." *Rauser v. Horn*, 241 F.3d 330 (3d Cir. 2001) (quoting *Allah*, 229 F.3d at 225).

With respect to the first prong, the filing of a lawsuit is protected conduct that clearly falls within the ambit of the First Amendment. *See Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *see also Allah*, 229 F.3d at 224 (noting that it is well settled that "prisoners have a constitutional right to access to the courts"). The First Amendment is implicated in cases in which prisoners allege that they have suffered adverse actions in retaliation for filing lawsuits. *Peterkin v. Jeffes*, 855 F.2d 1021, 1036 (3d Cir. 1988); *Cook v. Boyd*, 881 F. Supp. 171, 176 n.4 (E.D. Pa. 1995). Here, in his amended complaint, Plaintiff claims that the Defendants' conduct reflects retaliation for planning to file a lawsuit against them in connection with the August 11, 2012 incident with PA Potter, which, at this

26

stage in the litigation, satisfies the protected conduct element.

Next, the prisoner must show that he has suffered some adverse action at the hands of prison officials. *See Rauser*, 241 F.3d at 333 (citing *Allah*, 229 F.3d at 225)). A prisoner can satisfy this prong by demonstrating that the action was sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *See id*. Here, Plaintiff contends that because certain Defendants discovered that he was filing a lawsuit against them, all Defendants participated in subjecting him to unconstitutional conditions of confinement in the SHU. Clearly, such actions in response to filing a lawsuit would be considered adverse.

The third prong requires the prisoner to show "a causal link between the exercise of his constitutional rights and the adverse action taken against him." *Rauser*, 241 F.3d at 333. To demonstrate this link, the prisoner must prove that his constitutionally protected conduct was "a substantial or motivating factor" in the decision to take adverse action against him. *Id*. (citing *Mount Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). In light of the conditions of confinement allegations set forth by Plaintiff and not addressed by Defendants, at this stage in the litigation the court cannot say that Plaintiff will not be able to satisfy this prong of the retaliation claim upon discovery on the Eighth

Amendment allegations.  Thus, the court will allow this claim to proceed.[8]

## IV.   Conclusion

For the reasons set forth herein, the motions to dismiss will be granted with respect to the Eighth Amendment claim of deliberate indifference to Plaintiff's medical needs.  The following claims will proceed: (1) an Eighth Amendment claim of excessive use of force against Defendant PA Potter; (2) Eighth Amendment failure to protect / failure to intervene claims against BOP Defendants; (3) Eighth Amendment conditions of confinement claims against all Defendants; (4) an access to the courts claim against Defendant Fosnot; and (5) a retaliation claim against all Defendants.

---

[8] The act of detaining Plaintiff in the SHU two (2) days after he called his brother to seek legal assistance in bringing suit related to the incident with PA Potter, coupled with Plaintiff's allegation that the BOP monitors telephone calls and Plaintiff's resultant conditions of confinement in the SHU, allegations not addressed by either set of Defendants, may separately constitute adverse action sufficient to support a First Amendment retaliation claim.  However, the court cautions that the requisite causality may be in doubt.  "[A] suggestive temporal proximity between the protected activity and the alleged retaliatory action can be probative of causation," *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003), but "[e]ven if timing alone could be sufficient to establish a causal link, . . . the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred," *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003).  Nevertheless, at this stage in the litigation, and in light of the fact that neither set of Defendants address Plaintiff's allegations with respect to the conditions of confinement, this claim may proceed.

An appropriate order will issue.


<u>S/Sylvia H. Rambo</u>
United States District Judge




Dated: March 31, 2015.