IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WALTER RODRIGUEZ,** | : | **Civil No. 1:12-CV-02090** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Judge Sylvia H. Rambo)** |
| | : | |
| | : | |
| **WARDEN J.E. THOMAS, et al.,** | : | |
| | : | |
| **Defendants** | : | |

# M E M O R A N D U M

Plaintiff Walter Rodriguez, a federal inmate formerly incarcerated at the minimum-security Federal Prison Camp at the United States Penitentiary in Lewisburg, Pennsylvania ("USP-Lewisburg"), initiated this action against several Bureau of Prisons ("BOP") officials[1] with a *Bivens*[2]-styled complaint on October 18, 2012, as amended on July 9, 2014, and as supplemented on August 19, 2014

---

[1] Named as Defendants are USP-Lewisburg Warden J.E. Thomas, Physician Assistant ("PA") Leonard Potter, PA Douglas McClintock, Lieutenant Daniel Knapp, Lieutenant Hult, Correctional Officer ("CO") David Eichner, CO Ty Crawley, and Special Investigative Service Agent ("SIS") James Fosnot.

On January 14, 2014, the court directed Plaintiff by order to provide the address of Defendant Hult for purposes of service of his complaint by the U.S. Marshals Service. (Doc. 59.) Plaintiff provided the address on January 27, 2014, (Doc. 64), and an order directing the U.S. Marshal to serve a summons and the amended complaint on Defendant Hult was issued, (Doc. 171). The summons was returned executed on April 15, 2015. (Doc. 176.) To date, Defendant Hult has not answered the amended complaint.

[2] *Bivens* actions are the federal counterpart to § 1983 claims brought against state officials. *Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004) (citing *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 800 (3d Cir. 2001)). "[C]ourts have generally relief upon the principles developed in the case law applying section 1983 to establish the outer perimeters of a *Bivens* claim against federal officials." *Schrob v. Catterson*, 948 F.2d 1402, 1409 (3d Cir. 1991).

and September 15, 2014.  (Docs. 105, 138, 146-1.)  In the amended complaint,

Plaintiff alleges that his constitutional rights were violated in connection with a

physical and verbal assault by Defendant PA Potter and subsequent medical care;

that several Defendants subsequently retaliated against him after it was discovered

that he wished to pursue legal action against Defendants; and, that he was

subjected unconstitutional conditions of confinement in his restricted confinement

cell.

Presently before the court are four motions for summary judgment, filed

by Defendants.  (Docs. 216, 223, 228, 234.)  For the reasons set forth below, the

motions for summary judgment will be granted in part and denied in part.


## I.    <u>Background</u>

### A. <u>Facts</u>

For purposes of addressing the motions for summary judgment, the court

will set forth the allegations in the amended complaint, along with any factual

disputes between the parties as set forth in the filed statements of material facts.

All the events in the amended complaint occurred at various security level facilities

at Plaintiff's former place of confinement, USP-Lewisburg.

Plaintiff is a chronic care inmate suffering from chronic diabetes and "other chronic ailments." (Doc. 105 ¶ 71; Doc. 217 ¶ 2; Doc. 229 ¶ 2.) Plaintiff requires insulin and monitoring to treat his diabetes. (Doc. 105 ¶ 71.)

On August 11, 2012, between approximately 9:15 and 9:30 p.m., while located at a unit at the Federal Prison Camp in Lewisburg, Plaintiff started to feel sick, lightheaded, nauseous, dizzy, weak, and disoriented. (*Id.* ¶ 14.) He thought he was going to faint. (*Id.*) As a result, he approached Correctional Officer ("CO") Ross[3] at the Office Station and asked him to call the paramedics. (*Id.* ¶ 15.) CO Ross opened the medical room for Plaintiff and allowed him to check his blood sugar level with a glucometer. (*Id.*) The blood sugar level read "high," or over 500. (*Id.*) Plaintiff asserts that the normal range is between 90 and 110. (*Id.*)

CO Ross called Defendant PA Potter, who was located at the Lewisburg Penitentiary at the time, to inform him of Plaintiff's condition.[4] (*Id.* ¶ 16.) According to Plaintiff, PA Potter "showed reluctance" to travel to Plaintiff at the Camp, and instead instructed Plaintiff to drink water and return to bed. (*Id.*) Plaintiff then returned to his unit. (*Id.*)

---

[3] Correctional Officer Ross is not a Defendant in this action.

[4] Defendant Potter asserts in his statement of material facts that Plaintiff did not have regular contact with him, (Doc. 217 ¶ 3), and that Plaintiff, in fact, believes he only had contact with Defendant Potter on three or four occasions while at Lewisburg, (Doc. 217 ¶ 4). Plaintiff counters, however, that since making such a statement, he has learned that it was Defendant Potter who was dispensing Plaintiff's medication in Lewisburg's SHU. (Doc. 249 at 1-2 ¶ 3,4; *see also infra* note 8, at 9.)

Later, when CO Ross and Defendant CO Eichner came to the unit to perform the inmate count, CO Ross called in a "medical emergency" for Plaintiff. (*Id.* ¶ 17.) Two inmates assisted Plaintiff to the medical room at the Camp's Administration Building, where Plaintiff laid down on a medical bed. (*Id.*) CO Eichner remained in the room with Plaintiff until PA Potter and Defendant Lieutenant Knapp arrived. (*Id.*) Fifteen (15) minutes after CO Ross called in the "medical emergency," and approximately twenty-five (25) minutes after Plaintiff first notified CO Ross about his condition, PA Potter and Lieutenant Knapp arrived at the medical room. (*Id.*)

Upon arriving at the medical room, PA Potter yelled, "What the f*** am I here for? What the f*** you expect me to do?" (*Id.* ¶ 18.) Plaintiff responded, "help me." (*Id.*) PA Potter then asked Plaintiff to extend his left arm in order to "finger stick" him. (*Id.* ¶ 19.) After Plaintiff did this, PA Potter grabbed Plaintiff's wrist and threw his arm back aggressively.[5] (*Id.*) PA Potter then prepared a syringe and injected Plaintiff "with force," causing pain to Plaintiff. (*Id.* ¶ 20.) PA Potter then grabbed Plaintiff by his shirt and pulled him to a sitting position. (*Id.*) Plaintiff asserts that he feared for his safety and physical well-being and believed

---

[5] In his statement of material facts, Defendant Potter asserts that, although Plaintiff stated that Potter is "known for his aggressiveness" by the Camp population, Plaintiff had no personal knowledge of any other inmate who complained about Potter or considered him aggressive. (Doc. 217 ¶¶ 6, 7.) Plaintiff counters that he heard inmates in the dispensary line complain about Potter being rude, hostile, and disrespectful. (Doc. 249 at 2 ¶ 6.) Plaintiff also asserts that, on the night of the August 11, 2012 incident, an unnamed Correctional Officer encouraged Plaintiff to file a complaint against Potter because he was an "abuser" and hostile towards inmates. (*Id.*)

PA Potter would strike him. (*Id*. ¶ 21.) When Plaintiff stood up, PA Potter struck him on the back of his neck and shoved him forward, causing further pain to Plaintiff. (*Id*. ¶ 22.) PA Potter cursed at Plaintiff, "Get the f**k out of my office," and pushed Plaintiff out of the room. (*Id*. ¶ 23.)

After he left the office and was staggering down the hallway, Plaintiff heard PA Potter asking CO Eichner, "Where did he go? Where did he go?" (*Id*. ¶ 24.) PA Potter then threw a sandwich at Plaintiff that struck him on his back as he walked down the hallway. (*Id*. ¶ 25.) Plaintiff claims that CO Eichner and Lieutenant Knapp witnessed these events and did not intervene at any point.[6] (*Id*. ¶ 26.) Plaintiff also avers that PA Potter never monitored or followed up with Plaintiff's condition after treatment. (*Id*. ¶ 27.)

During his deposition taken in connection with this litigation, Plaintiff testified that he does not remember how long the entire incident on August 11, 2012 lasted. (Doc. 225-1 at 16; 42-43.) He testified that Defendant Knapp was in the room for the entire incident, standing at the foot of Plaintiff's bed at the time, but Defendant Knapp did not touch him, (*id*. at 76-77), nor did Plaintiff complain to Defendant Knapp, (Doc. 249 at 9 ¶ 7). Plaintiff could not remember if Defendant Knapp spoke to him at all. (*Id*. at 77.) Plaintiff also admits that, since

---

[6] In response to Defendant Eichner's statement of material facts, Plaintiff now admits that his only claim against Defendant Eichner is that Eichner failed to intervene in the alleged assault by Defendant Potter on August 11, 2012. (Doc. 249 at 8 ¶ 11.)

the incident, he has had no contact with Defendant Knapp and that Defendant Knapp is not responsible for any of his injuries. (Doc. 249 at 9 ¶ 13.) As to Defendant Eichner, Plaintiff testified that he remained by the door during the incident, and could not remember if he stepped out of the room at any time. (*Id.* at 79.) Plaintiff also testified that, as a result of the incident with Defendant PA Potter, he did not bleed, (*id.* at 42); he did not remember if he was bruised, (*id.*); he did not fall to the ground when struck and shoved by Potter (*id.*); and, he was not injured when struck with the sandwich, (*id.*). (*See also* Doc. 217 ¶¶ 13-15, 18; Doc. 224 ¶ 4.) Further, Plaintiff stated that he never treated with a physician for a physical or mental injury resulting from the incident. (Doc. 225-1 at 45-46; *see also* Doc. 217 ¶ 19; Doc. 224 ¶ 4; Doc. 235 ¶ 15.) In addition, Plaintiff has never been diagnosed with a physical or mental condition as a result of this incident. (Doc. 225-1 at 46; *see also* Doc. 217 ¶ 20; Doc. 224 ¶ 5.) In Plaintiff's counter statement of material facts, he now asserts that he asked for medical and psychological help afterwards, but was denied assistance and, instead, was sent to a restricted housing unit at USP-Lewisburg, or the "SHU." (Doc. 249 at 4, 6, 7.)

After the August 11, 2012 incident, on the same night between approximately 9:50 p.m. and 10:05 p.m., Plaintiff called his brother, Pablo Rodriguez, to tell him about the incident with PA Potter and ask that he search for an attorney for legal advice. (Doc. 105 ¶ 30.) Plaintiff also told his brother that he

planned to write everything down in detail and mail the account to him for use by an attorney. (*Id.*) Plaintiff avers that it is BOP policy to monitor and record telephone calls. (*Id.*)

The next morning, August 12, 2012, Plaintiff went to the medical department to get his insulin shot and notified the PA on duty that he was having pain in the back of his neck. (*Id.* ¶ 31.) Plaintiff asked for painkillers, but was told to buy aspirin from commissary instead. (*Id.*) He was not further treated for his neck pain. (*Id.*) Plaintiff saw a Correctional Officer Wagner at his cell when he returned from medical and told her about his distress over his condition. (*Id.*)

On August 13, 2012, at 3:55 p.m., Plaintiff went to see the facility's psychologist, Dr. Banks, to seek help for depression and emotional distress. (*Id.* ¶ 31.) Plaintiff avers that he was still in shock and was suffering from nightmares and panic attacks. (*Id.*)

Two days after Plaintiff placed the telephone call to his brother, on August 14, 2012, at approximately 8:00 a.m., a correctional officer arrived at Plaintiff's prison workplace, Unicor Recycling, and detained him. (*Id.* ¶ 32.) Plaintiff was separated from general population and placed in administrative detention in USP-Lewisburg's SHU. (*Id.*) Plaintiff avers that Defendant SIS Agent Fosnot made this decision and specifically placed Plaintiff in "G" block, which holds gang members and violent inmates. (*Id.*) Plaintiff further asserts that

he was "distressed" about the move to the SHU because he knew PA Potter worked there.  (*Id.* ¶ 34.)

Once Plaintiff arrived at the SHU, he was placed in a temporary cell and interviewed by Agent Fosnot and a psychologist.  (*Id.* ¶ 35.)  Plaintiff told them about the incident with PA Potter and about his health issues.  (*Id.*)  At the end of the interview, Agent Fosnot told Plaintiff, "it sucks to be you now."  (*Id.*)  Plaintiff was then placed in an SHU cell.  (*Id.*)  At his deposition, Plaintiff testified that Agent Fosnot told him that, rather than return him to the Camp, he was placing Plaintiff in the SHU cell "for [his] own security."  (Doc. 225-1 at 56.)

On August 18, 2012, Defendant PA McClintock approached Plaintiff in the SHU and told him that Plaintiff would be staying in the SHU program for eighteen (18) months.  (Doc. 105 ¶ 36.)  Before walking away, PA McClintock laughed and said, "Potter will see you soon."  (*Id.*)  Further, each time PA McClintock came to Plaintiff's SHU cell to administer Plaintiff's insulin and other medication,[7] he told Plaintiff, "this is your new home for the next 18 months."  (*Id.* ¶ 38.)  Plaintiff asserts that, because he did not trust PA McClintock with his medication and feared harm, he refused to take his medication.  (*Id.* ¶ 39.)  However, on approximately four (4) occasions, Plaintiff took insulin and other

---

[7] Plaintiff avers that PA McClintock came to his SHU cell to administer medication on the following dates in 2012: September 28, 29; October 9, 12-14, 27, 28, 31; and, November 4. (Doc. 105 ¶ 38.)

medication from a correctional officer he did not recognize. (*Id.* ¶ 40.) A PA was present on these occasions, apparently shielded from Plaintiff's view by the cell door, (*see* Doc. 225-1 at 62), and Plaintiff eventually discovered that the PA was PA Potter, (Doc. 105 ¶ 40). This discovery caused distress for Plaintiff, including extreme headaches. (*Id.* ¶ 42.)

On September 12, 2012, at approximately 7:00 p.m., PA Potter called Plaintiff a "dumb a\*\*." (*Id.* ¶ 43.) In addition, Plaintiff discovered that PA Potter was preparing his insulin and other medication.[8] (*Id.*) Because Plaintiff feared for his life, when PA Potter would give him the insulin syringe, Plaintiff would pretend to inject himself with it, but instead would empty it into the air. (*Id.*) He also kept his pills under his tongue in order to spit them out later. (*Id.*)

On September 16, 2012, Plaintiff wrote complaints to Defendants Lieutenant Hult and Warden Thomas, expressing his concerns over being approached by PA Potter, but these complaints were ignored. (*Id.* ¶ 45.) Warden Thomas counters that, complaints such as those made by Plaintiff, are not typically ignored; rather, Defendant Thomas refers all complaints for investigation to the SIS. (Doc. 235 ¶ 9.) In his counter statement of material facts, Plaintiff adds that

---

[8] Plaintiff avers that PA Potter came to his SHU cell to administer medication on the following dates in 2012: September 17, 21, 23, 26; October 1, 2, 5-7, 11, 21, 23-25; and, November 8. (Doc. 105 ¶ 46.) Every time PA Potter came to Plaintiff's cell he called him an "a\*\*hole." (*Id.* ¶ 47.)

Warden Thomas is briefed about the complaint first, signs a report, and then forwards it for investigation. (Doc. 249 at 8 ¶ 9.)

On September 27, 2012, after PA McClintock heard that Plaintiff was suing him, he threatened Plaintiff with a "you wanna play games" statement.[6] (Doc. 105 ¶ 37.) The following morning, Plaintiff asked Defendant CO Crawley to turn off the light in his SHU cell because he had headaches and could not sleep. (*Id*. ¶ 48.) CO Crawley responded, "suck it up, and next time don't come to the SHU," and refused to turn off the light. (*Id*.) He also denied Plaintiff a shower. (*Id*.) On October 3, 2012, CO Crawley again denied Plaintiff a shower. (*Id*. ¶ 50.)

On October 20, 2012, Plaintiff told a psychologist at his SHU cell that he could not sleep due to the bright lights being on all day and night, and that he was having constant headaches and severe depression. (*Id*. ¶ 49.)

On October 23, 2012, after seventy (70) days of confinement in the SHU, Agent Fosnot came to Plaintiff's cell to take a statement and told Plaintiff, "You shouldn't be here." (*Id*. ¶ 51.) Two days later, on October 25, 2012, Plaintiff was taken to an outside doctor's appointment, but the correctional officer escorting him teased him, saying, "watch it, watch it, here comes PA Potter," and, "it is a good thing we don't have cameras in this area." (*Id*. ¶ 52.) The CO also told Plaintiff,

---

[6] The court is unsure of what a "you wanna play games" statement is and Plaintiff has provided no further information as to the context of such a statement.

"If you were at the Camp you would not have to put up with being handcuffed and shackled." (*Id*. ¶ 53.)

On November 15, 2012, Agent Fosnot transferred Plaintiff to USP-Allenwood's SHU without informing Plaintiff of the SIS investigation findings. (*Id*. ¶ 55.) Plaintiff remained in restricted confinement, segregated from general population. (*Id*. ¶ 61.) Subsequently, on January 22, 2013, Plaintiff was transferred to FCI-Schuylkill's Medium Facility SHU, where he remained in restricted confinement and segregated from general population. (*Id*. ¶ 62.) Once there, Plaintiff was evaluated by a psychologist and he told her about his previous SHU confinement. (*Id*. ¶ 63.) Thereafter, on January 25, 2013, Plaintiff was released to the FCI-Schuylkill's Camp general population. (*Id*. ¶ 64.)

In addition to providing the aforementioned chronological background with respect to his confinement in the SHU, Plaintiff also asserts the following facts with respect to the conditions of his confinement there. While confined in USP-Lewisburg's SHU, Plaintiff was locked down 24/7, with two cell mates in a six (6) by nine (9) foot cell. (*Id*. ¶ 57.) The cell always held three (3) inmates, despite availability in other cells. (*Id*. ¶ 58.) Plaintiff was provided with no recreation, nor was he permitted to go to the law library. (*Id*. ¶ 57.)

Plaintiff and his cell mates were never provided with a mop or broom to clean the cell, and paint was peeling from the ceiling. (*Id*. ¶ 59.) The cell's toilet

would clog with fecal matter and toilet paper for days.  (*Id*.)  In addition, the cell was infested with cockroaches and mice.  (*Id*.)  It was also extremely hot, causing Plaintiff to feel thirsty and dehydrated.  (*Id*.)  Plaintiff does not indicate how he attempted to grieve these conditions to prison staff, other than to simply state that he complained to correctional officers.  (*Id*.)

Overall, Plaintiff asserts that he was subjected to a total of 165 days in restricted confinement, 91 of which were in USP-Lewisburg's SHU, in retaliation for what prison officials overheard in Plaintiff's telephone conversation with his brother following the incident with PA Potter and for "denouncing the physical and verbal assault inflicted to him by PA Potter."  (*Id*. ¶ 65.)  He terms his treatment in the SHU as a "campaign of harassment."  (Doc. 225-1 at 59.)  He further asserts that, prior to being placed in restricted confinement, he had a job with Unicor Industries, was participating in institutional educational programs, was regularly attending religious services, and was taking college correspondence classes.  (Doc. 105 ¶ 66.)  These activities, as well as his general support network, were interrupted by his retaliatory restrictive confinement.  (*Id*.)

### B.  Procedural History

Plaintiff initiated this civil action with a complaint filed on October 18, 2012.  (Doc. 1.)  However, by order dated May 13, 2014, the court granted Plaintiff's motion for leave to file an amended complaint.  (Doc. 95.)  The

amended complaint was filed on July 9, 2014, (Doc. 105), and supplemented on August 19, 2014, (Doc. 138), and September 15, 2014, (Doc. 146-1).

Defendants filed motions to dismiss the amended complaint. (Docs. 107 & 129.) In a memorandum and order issued on March 31, 2015, the court granted in part and denied in part the motions to dismiss. (Docs. 174 & 175.) Specifically, Plaintiff's Eighth Amendment claim of deliberate indifference to his medical needs was dismissed, and the following claims were permitted to proceed: (1) an Eighth Amendment claim of excessive use of force against Defendant PA Potter; (2) Eighth Amendment failure to protect / failure to intervene claims against BOP Defendants; (3) Eighth Amendment conditions of confinement claims against all Defendants; (4) an access to the courts claim against Defendant Fosnot; and (5) a retaliation claim against all Defendants.

Defendants have now filed motions for summary judgment, seeking judgment in their favor as to all these claims. (Docs. 216, 223, 228, 234.) Responsive and reply briefings have been filed. Thus, the motions for summary judgment are ripe for disposition.

## II. <u>Standard of Review</u>

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for granting a motion for summary judgment. Rule 56(a) provides, "[t]he court shall

13

grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A

factual dispute is "material" if it might affect the outcome of the suit under the

applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis

that would allow a reasonable fact-finder to return a verdict for the non-moving

party. *Id*. When evaluating a motion for summary judgment, a court "must view

the facts in the light most favorable to the non-moving party," and draw all

reasonable inferences in favor of the same. *Hugh v. Butler Cnty. Family YMCA*,

418 F.3d 265, 267 (3d Cir. 2005), *cert. denied*, 546 U.S. 1094 (2006).

The moving party bears the initial burden of demonstrating the absence of a

disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving

party points to evidence demonstrating no issue of material fact exists, the non-

moving party has the duty to set forth specific facts showing that a genuine issue of

material fact exists and that a reasonable factfinder could rule in its favor." *Azur v.*

*Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving

party may not simply sit back and rest on the allegations in its complaint; instead,

it must "go beyond the pleadings and by [its] own affidavits, or by the depositions,

answers to interrogatories, and admissions on file, designate specific facts showing

that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.   **Discussion**

As stated above, there are four motions for summary judgment pending in the instant case. In Defendant PA Potter's motion, he argues that summary judgment should be granted in his favor on the following grounds: (1) Plaintiff's allegations, even if true, do not support a claim against PA Potter for use of excessive force; and (2) there are no facts in the record to support Plaintiff's claims of conditions of confinement and retaliation against PA Potter, as Plaintiff has not shown any personal involvement by Potter in these claims. In Defendant Eichner's motion, he argues that summary judgment should be granted in his favor on the following grounds: (1) because Plaintiff's allegations of excessive force against PA

Potter do not rise to the level of a constitutional violation, Plaintiff's claims for failure to protect / failure to intervene against Defendant Eichner, made in connection with the excessive force claim, must fail; (2) assuming, *arguendo*, that Plaintiff has established the excessive force claim against PA Potter, there is no evidence that Defendant Eichner had a realistic and reasonable opportunity to intervene; and (3) there is no evidence that Defendant Eichner had any personal involvement with regard to the conditions of confinement and retaliation claims. In Defendant Knapp's motion, he argues that summary judgment should be granted in his favor because: (1) Plaintiff has made no allegations in support of claims of failure to protect / failure to intervene with respect to Defendant Knapp's actions in the medical room on August 11, 2012; and (2) there is no evidence that Defendant Knapp had any personal involvement with regard to the conditions of confinement and retaliation claims. In BOP Defendants' motion, they argue that summary judgment should be entered in their favor on the following grounds: (1) Plaintiff has failed to produce sufficient evidence in support of claims of failure to protect / failure to intervene against any of the BOP Defendants; (2) Plaintiff's conditions of confinement claims do not rise to the level of a constitutional violation; (3) Plaintiff has failed to establish an access to the courts claim against Defendant Fosnot; (4) Plaintiff has failed to establish a retaliation claim against BOP Defendants; and (5) Plaintiff has failed to establish a due process claim against

Defendant Fosnot. The court will discuss the lack of personal involvement of the Defendants with respect to Plaintiff's claims first, followed by a discussion of the merits of the claims as they relate to the remaining relevant Defendants.

### A. **Personal Involvement**

A *Bivens* civil rights action under § 1331 has the same standards as does a § 1983 civil rights action. *See Paton v. LaPrade*, 524 F.2d 862, 871 (3d Cir. 1975); *Veteto v. Miller*, 829 F. Supp. 1486, 1492 (M.D. Pa. 1992); *Young v. Keohane*, 809 F. Supp. 1185, 1200 n.16 (M.D. Pa. 1992); *Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 457 n.1 (M.D. Pa. 2010) (citing *Egevary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004)). To state a claim under *Bivens*, a plaintiff must allege that he was deprived of a federal right by a person who was acting under color of federal law. *See Young*, 809 F. Supp. at 1199; *West v. Atkins*, 487 U.S. 42, 48 (1988).

It is well established that personal liability in a civil rights action cannot be imposed upon an official based on a theory of *respondeat superior*. *See*, *e.g.*, *Rizzo v. Goode*, 423 U.S. 362 (1976); *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976). It is also well-settled in the Third Circuit that personal involvement of defendants in alleged constitutional deprivations is a requirement in a civil rights case and that a complaint must allege such personal involvement. *Sutton v. Rasheed*, 323 F.3d 236, 249-50 (3d Cir. 2003). "A defendant in a civil rights action must have personal involvement in the alleged

wrongs . . . . [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998); *see also Atkinson v. Taylor*, 316 F.3d 257 (3d Cir. 2003). Such allegations, however, must be made with appropriate particularity in that a complaint must allege the particulars of conduct, time, place, and person responsible. *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005); *Rode*, 845 F.2d at 1207-08. Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement. *Rode*, 845 F.2d at 1208.

Certain Defendants argue that the evidence fails to establish that they had any involvement in the August 11, 2012 incident, the Eighth Amendment conditions of confinement claims, and the retaliation claim. The court will address these claims *seriatim*.

## 1. **August 11, 2012 Incident**

Plaintiff alleges that the actions of Defendant Potter on August 11, 2012, constituted excessive use of force in violation of the Eighth Amendment. It is clear from the record that Plaintiff is not alleging that any of the other Defendants are personally involved in this excessive use of force claim. Turning to the failure to protect / failure to intervene claims related to this same August 11, 2012 incident, the record also reveals that Defendants Thomas, McClintock, Crawley, and Fosnot

were nowhere near the event at the time, and therefore had no opportunity or ability to intervene or provide protection to Plaintiff. Further, to the extent that Plaintiff asserts this claim against Defendant Warden Thomas, (*see* Doc. 105 at 15 ¶ 89), the claim, in essence, is nothing more than an assertion of *respondeat superior* liability which seeks to hold the Warden liable based on his supervisory role. This ground of constitutional liability has been squarely rejected by the courts. *See Rode*, 845 F.2d at 1207. The court will grant summary judgment to Defendants Thomas, McClintock, Crawley, and Fosnot on the failure to protect / failure to intervene claims.

## 2. Conditions of Confinement and Retaliation Claims

In their briefs in support of summary judgment, Defendants Eichner, Knapp, and Potter argue that Plaintiff has not shown their personal involvement in the conditions of confinement and retaliation claims and, therefore, summary judgment on these issues should be granted in their favor. Further, Defendants Eichner and Knapp claim that Plaintiff acknowledged at his deposition that he is not asserting his conditions of confinement and retaliation claims against them. (Docs. 225 at 13; Doc. 230 at 15.)

Addressing Defendants Eichner and Knapp's personal involvement first, the court notes that, in response to the argument regarding Plaintiff's deposition statements, Plaintiff generally asserts that "some" of his answers at his deposition

were "defective," and that "questions were vague and not specific and at time[s] confusing, and thus jeopardized the defense of the Plaintiff." (Doc. 247 at 6.) While Plaintiff's response may raise the possibility of disputed facts here, a careful review of the amended complaint confirms that Plaintiff does not allege that either Defendants Eichner or Knapp was personally involved in: (1) the decision to place Plaintiff in the SHU in retaliation for his seeking legal action against them after the August 11, 2012 incident, or (2) subjecting him to the unconstitutional conditions of confinement in the SHU. Plaintiff has failed to offer any evidence disputing the lack of personal involvement by these Defendants. The party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" and cannot survive Rule 56 scrutiny by relying on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989). As Plaintiff has failed to demonstrate a genuine issue of fact as to whether Defendants Eichner or Knapp were personally involved in the conditions of confinement and retaliation claims, summary judgment will be granted in favor of these Defendants as to those claims.

Turning to Defendant Potter, Potter argues that Plaintiff has presented no evidence whatsoever that he conspired with or contributed to Plaintiff's transfer and confinement in USP-Lewisburg's SHU in retaliation for seeking legal action against corrections officials. The court disagrees, in part, and instead will include

Defendant Potter in its discussion of the conditions of confinement and retaliation claims.

**B. <u>Excessive Use of Force</u>**

Plaintiff has claimed that Defendant Potter used excessive force on August 11, 2012, when Potter was called to the Lewisburg Prison Camp's medical room to assess Plaintiff's medical condition and administer treatment. In order for Plaintiff's claim to proceed against Defendant Potter, Plaintiff must first establish the existence of a constitutional violation. Accordingly, the court will first address this threshold inquiry.

In order for a prisoner to state an Eighth Amendment claim for the excessive use of force by a prison official, he must establish that the force was not applied in a good-faith effort to maintain or restore discipline, but that it was maliciously and sadistically used to cause harm. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). "In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) 'the need for the application of force;' (2) 'the relationship between the need and the amount of force that was used;' (3) 'the extent of injury inflicted;' (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them;' (5) 'any efforts made to temper the severity of a forceful response.'" *Brooks v. Kyler*, 204 F.3d 102, 106

(3d Cir. 2000) (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).  The prisoner

need not show significant injury to state an excessive use of force claim.  *Hudson*,

503 U.S. at 8, 10.  However, "[t]hat is not to say that every malevolent touch by a

prison guard gives rise to a federal cause of action.  The Eighth Amendment's

prohibition of 'cruel and unusual' punishments necessarily excludes from

constitutional recognition *de minimis* uses of physical force, provided that the use

of force is not of a sort repugnant to the conscience of mankind."  *Id*. at 9-10

(citations omitted).

Here, Defendant Potter denies the allegations in the amended complaint

"in all respects."  (Doc. 218 at 11.)  While he does concede that he treated Plaintiff

on August 11, 2012, and subsequently threw a snack sandwich at Plaintiff after

treatment, he argues that his conduct does not rise to the level of a constitutional

violation by virtue of the fact that Plaintiff has not shown physical or mental injury

resulting from the incident.  (*See id*. at 11-14.)  However, n support of his claim,

Plaintiff cites to the BOP's Office of Internal Affairs ("OIA") Investigative Report,

which sets forth its findings based on varying accounts by Defendants Potter,

Eichner, and Knapp, as well as Plaintiff.  (Doc. 247 at 12-13.)

Specifically, in his affidavit, Defendant Potter recounted the August 11,

2012 incident as follows:

> That I remember the incident with inmate Rodriguez.  That I
> responded with Lieutenant Knapp and inmate Rodriguez was walking

into the exam room. That inmate Rodriguez then laid down on the bed and became unconscious. After the inmate did not respond to verbal stimuli, I then used mild painful stimuli, which is a technique used for an unresponsive inmate and squeezed his finger approximately two times. That I remember talking to inmate Rodriguez and asking him if he was alright but I don't believe I ever cursed at him by saying "fuck." That I didn't jam the needle into Rodriguez's arm, I just gave him a shot like I normally do. That after I gave him the shot, inmate Rodriguez sat up on his own and then started to fall over so I reached down and grabbed him where the shoulder meets the neck. I never slapped him. That I then told him he was done and to have a good day and Rodriguez walked out of the office. I never told him to "get the fuck out of the office." That I then got him a diabetic sandwich and I was about 4 feet away from him and I underhand tossed the sandwich to Rodriguez. He had his hands in front of his face and the sandwich went between his hands and hit him in the face.

(Doc. 266 at 68-69.)

Defendant Eichner, in his affidavit, stated the following with respect to the August 11, 2012 incident:

That I remember Potter was pretty angry about having to come down to the camp, but I don't specifically recall if he cursed at the beginning or not. That Potter grabbed inmate Rodriguez's fingers and forcibly pulled them apart because he wasn't responding to his questions. I saw no medical reason for why Potter would do this. That when Potter injected inmate Rodriguez, he jammed it into his arm with what I would call unnecessary force. That although Lieutenant Knapp was in the area, he spent most of the time in the hallway and it is very possible he did not witness much of the incident and I'm not sure what he may have seen. That after the injection, Potter slapped the back of inmate Rodriguez's neck and I remember this because I could hear the slap on the back of his neck. At this point, Potter did not even allow enough time for the injection to take effect, so I would not say it was Potter just trying to help him up in a medical way. That Potter then proceeded to pick him up by the back of the neck and then he pushed him out of the exam room. That at

this point, I did hear Potter say, "Now get the fuck out of my office" and as inmate Rodriguez was leaving the area, he was literally crying. . . . I never saw Potter throw a sandwich at the inmate.

(*Id*. at 57-58.)

Defendant Knapp asserted in his affidavit, in part, the following recollection of the incident:

That Potter started asking inmate Rodriguez questions and he was unresponsive. I don't recall if Potter said fuck at this point or not but Potter was asking him what the issue was or something to that effect. That Potter then took his blood glucose testing and inmate Rodriguez just continued to lay there and moan. At no time did I observe Potter use any force on inmate Rodriguez and after he took his glucose reading, Potter then gave him an injection to his upper arm. That Potter then told inmate Rodriguez he was done with him and he could return to his unit. Inmate Rodriguez still sat there slumped over and moaning. It was at this time, Potter put his hand under his arm and his other hand around the back of his neck and assisted him to a sitting and then standing position. That in my opinion what Potter did was help the inmate get to his feet after being issued medication in order to assist him and at no time did I ever consider it to be any type of use of force on inmate Rodriguez. That at this point, Potter did tell inmate Rodriguez to get the fuck out of the office. That I never saw Potter throw a sandwich at the inmate.

(*Id*. at 60-61.)

Plaintiff made the following assertions in his affidavit:

That Potter began cussing at me by saying, "What the fuck am I here for, what do you expect me to do." Office Eichner and Knapp heard this. That Potter then asked me to put my left arm out and he grabbed my wrist and threw my arm back and then injected me with force on my left arm. That Potter then grabbed me by the shirt and pulled me up to a sitting position. I then stood up and Potter hit me with his right hand on the back of the neck and also pushed me forward at the same time. That Potter then pushed me and said, "get the fuck out of

my office." That I was then walking away and Potter came out of the
office and threw a diabetic sandwich at my back which hit me from
about 10 feet away.

(*Id*. at 71.)

The Special Investigative Agent, Defendant Fosnot, concluded the

following, as stated in his report dated November 21, 2012:

> The investigation revealed a preponderance of the evidence to support
> the allegation of Physical Abuse of an Inmate against Leonard Potter.
> Although Potter denied using any force, both inmate Rodriguez and
> Officer Eichner are very specific in stating Potter jammed or forced
> the needle into Rodriguez's arm.  Additionally, they also both recall
> Potter slapping inmate Rodriguez on the back of the neck and pushing
> him out of the exam room immediately after he was just treated with
> insulin.  Potter did admit he "tossed" a sandwich at inmate Rodriguez
> after just treating him, which struck Rodriguez in the face.  Thus, the
> charge of Physical Abuse of an Inmate is sustained against Potter.
> Furthermore, Lieutenant Knapp, Officer Eichner and inmate
> Rodriguez all confirm they heard Potter tell inmate Rodriguez to "get
> the fuck out of his office" at the conclusion of the incident.
> Therefore, the charge of Unprofessional Conduct is also sustained
> against Potter.

(*Id*. at 81.)

These conflicting accounts of what transpired create a genuine issue of

material fact as to whether Plaintiff was subjected to excessive force on August 11,

2012, especially in light of Defendant Potter's denial of the allegations before this

court.  Stated otherwise, even if Plaintiff is determined to have been assaulted,

there remains substantial disputed facts as to whether the assault was an excessive

use of force under the standard set forth in *Hudson*.  Accordingly, Defendant

Potter's motion for summary judgment will be denied and the matter will proceed to trial on this claim.[9]

## C. **Failure to Protect / Failure to Intervene**

In connection with his claim of excessive use of force on August 11, 2012, Plaintiff also asserts a claim of failure to protect / failure to intervene against Defendants. After careful review of the amended complaint, as well as the briefing on the instant motions for summary judgment, the court construes this claim by Plaintiff as one against Defendants Eichner and Knapp alone.[10]

Turning first to the failure to protect claim, it is well-settled that the Eighth Amendment requires that prison officials "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations omitted). In order to prevail on an Eighth Amendment failure to protect claim, an inmate is required to show that (1) he is incarcerated under conditions posing a substantial risk of serious harm; and (2) prison officials acted

---

[9] At trial, the court will not preclude the introduction of Defendant Potter's alleged verbal threats in connection with the claim of excessive use of force. It is well-settled that mere words spoken to a prisoner by a correctional officer, even when those words are harsh, do not amount to a violation of the prisoner's civil rights by the officer. *Johnson v. Glick*, 481 F.2d 1028, 1033 n.7 (2d Cir. 1973); *Ruta v. Morris*, No. 3:07-CV-1832, 2007 WL 3342771, at *2 (M.D. Pa. Nov. 7, 2007) (claim of verbal assault fails to state a cognizable claim). However, verbal threats or harassment, with some reinforcing act accompanying them, may state a constitutional claim. *Murray v. Woodburn*, 809 F. Supp. 383, 384 (E.D. Pa. 1993).

[10] From a careful review of the amended complaint, it is obvious that Plaintiff is asserting only that Defendants Eichner and Knapp failed to protect or intervene with respect to the August 11, 2012 incident. (*See generally* Doc. 105.) The undisputed facts further show that Defendants Thomas, McClintock, Crawley, and Fosnot were nowhere near the alleged event and, thus, would have had no opportunity or ability to provide protection or to intervene.

with deliberate indifference to his health and safety. *Id*. at 833-34, 47. *See also*

*Hamilton v. Levy*, 117 F.3d 742, 746 (3d Cir. 1997) (citing *Farmer*, 511 U.S. at

833-34, 38). A substantial risk of serious harm "may be established by much less

than proof of a reign of violence and terror," but requires more than a single

incident or isolated incidents. *See Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir.

1985). This does not require that an inmate must suffer an assault before obtaining

relief. *Id*. Deliberate indifference requires that the prison official "knows of and

disregards an excessive risk to inmate health or safety; the official must both be

aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at

837. "The knowledge element of deliberate indifference is subjective, not

objective knowledge, meaning that the official must actually be aware of the

existence of the excessive risk; it is not sufficient that the official should have been

aware." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001). Finally, the

inmate must show that "the official's deliberate indifference caused the harm."

*Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012).

Turning to a failure to intervene claim, in a case where an inmate claims

an officer had a duty to take reasonable steps to protect a victim from another

officer's use of excessive force, the inmate must prove that (1) the officer had a

duty to intervene; (2) the officer had the opportunity to intervene; and (3) the

officer failed to intervene.  *Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002).  Specifically, "an officer is only liable if there is a realistic and reasonable opportunity to intervene."  *Id*. at 651.

In this case, Plaintiff claims that Defendants Eichner and Knapp failed to protect him from, or intervene in the midst of, the alleged assault by Defendant Potter on August 11, 2012.  In support, he claims that the medical room where the incident occurred is a small room and, thus, Defendants Eichner and Knapp were "right next or close to" Plaintiff and also "close to" Defendant Potter, so "once they sensed hostile attitude by the actions of PA Potter that lead to the aggression, the defendants in the room could've suspected the aggression and intervene by stopping PA Potter from the aggression."  (Doc. 247 at 16.)  In Defendant Eichner's brief in support of summary judgment, he simply makes one blanket statement, without more, that Plaintiff has produced insufficient evidence to establish a constitutional violation.  (Doc. 225 at 11.)  In Defendant Knapp's supporting brief, he makes no reference at all to the failure to protect/failure to intervene claim, but simply states, "Plaintiff alleges no act by Knapp to violate Plaintiff's constitutional rights."  (Doc. 230 at 15.)

Upon review of the evidence presented, the court will deny summary judgment in favor of these Defendants on this failure to protect / failure to intervene claim.  There exists a genuine issue of material fact as to whether

Defendants Eichner and Knapp knew of the risk of harm posed to Plaintiff by Defendant Potter and failed to protect him or had the opportunity to intervene and failed to do so. In his affidavit, Defendant Eichner admits that he sensed at the beginning of the incident that "Potter was pretty angry about having to come down to the camp." (Doc. 266 at 57.) Defendant Eichner also clearly recalled Defendant Potter forcibly pulling Plaintiff's fingers apart at one point, and subsequently jamming a needle into Plaintiff's arm "with what I could call unnecessary force." (*Id*.) The time it took for Defendant Potter to perform these acts, and whether Defendant had a subjective awareness of the risk of harm to Plaintiff during that time and failed to protect him or intervene are disputed facts and, thus, matters for a jury. Further, from a review of Defendant Knapp's account of the incident, which clearly contradicts all other accounts, (*see supra* Part III.B, at 24 (citing Doc. 266 at 60-61)), the court finds disputed facts exist as to Knapp's subjective awareness of a risk of harm to Plaintiff and whether he failed to protect him, or whether he had the opportunity to intervene and failed to do so.

### D.  <u>Conditions of Confinement</u>

Plaintiff also claims that he was subjected to unconstitutional conditions of confinement in the SHU cell to which he was sent after the August 11, 2012 incident. The Eighth Amendment's prohibition of cruel and unusual punishment imposes duties on prison officials to provide prisoners with the basic necessities of

life, such as food, clothing, shelter, sanitation, medical care, and personal safety. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Helling v. McKinney*, 509 U.S. 25, 31 (1993). It is well settled that prison conditions constitute cruel and unusual punishment if they result in serious deprivations of basic human needs. *See Tillman v. Lebanon Cnty. Corr.Facility*, 221 F.3d 410 (3d Cir. 2000). A condition of confinement implicates the Eighth Amendment if it is so reprehensible as to be deemed inhumane under contemporary standards or deprives an inmate of minimal civilized measures of the necessities of life. *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992); *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). However, the Eighth Amendment does not mandate that prisons be free of discomfort. *Farmer*, 511 U.S. at 33 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

Under *Farmer*, an inmate must surmount the high hurdle of showing that a prison official actually knew or was aware of a substantial risk to inmate safety and deliberately disregarded that risk. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001). This requirement of actual knowledge means that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

The length of the inmate's exposure to the alleged unconstitutional conditions and the totality of the circumstances must be considered when making a

determination as to cruel and unusual punishment. A prisoner must also establish a specific deprivation of a single, identifiable necessity. *Wilson*, 501 U.S. at 304-05. In addition, the inmate must demonstrate that the prison official responsible for the conditions of confinement acted with "a sufficiently culpable state of mind." *Id*. at 298.

Finally, as set forth above, it is well established that personal liability in a civil rights action cannot be imposed upon an official based on a theory of *respondeat superior*. *See, e.g.*, *Rizzo*, 423 U.S. at 368; *Hampton*, 546 F.2d at 1082. Further, as the Third Circuit Court stated in *Rode*, 845 F.2d at 1207,

> A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

*Rode*, 845 F.2d at 1207 (citations omitted).

Prior to addressing Plaintiff's complaints regarding the conditions in USP-Lewisburg's SHU, the court notes that Plaintiff describes himself as a chronic care inmate suffering from chronic diabetes. (Doc. 105 at 11 ¶ 71.) In addition, Plaintiff asserts that, prior to his incarceration, he was diagnosed with depression, anxiety, and panic attacks. (Doc. 225-1 at 33, Pl. Dep.) In his amended complaint, Plaintiff does not specify his injuries connected to the conditions of confinement in the SHU, but makes this general assertion: "Rodriguez remained in the [USP-

Lewisburg SHU] for (91) days, where he was punished, humiliated, mistreated, harassed, and subject[ed] to a periodical psychological torture all along this time, in which was made worst [sic] under the harsh conditions of the confinement and affected Rodriguez's mental health for the worst [sic]." (Doc. 105 at 8 ¶ 56.)

In his amended complaint, Plaintiff makes several allegations about the conditions of his SHU cell at USP-Lewisburg. He complains that he was the third man locked down in a cell meant for two inmates. He complains that the cell is dirty, with paint peeling from the ceiling and a clogged toilet. He further complains the cell is infested with cockroaches and mice. He also complains that the cell is at times extremely hot and that a light in the cell is left on all night. Plaintiff also asserts that Defendant CO Crawley denied him a shower on two occasions. And finally, Plaintiff claims that he was denied recreation while housed in the SHU. There is nothing in the record aside from Plaintiff's blank allegations to support these claims.

As to Plaintiff's claim regarding the overcrowding in his cell, the court notes that, in deciding whether overcrowding is unconstitutional within a given setting, it is necessary to look to the "totality of the conditions." *Inmates of Allegheny Cnty. Jail v. Wecht*, 565 F. Supp. 1278, 1295 (W.D. Pa. 1983) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346-47 (1981)). In light of this case law, the court will first discuss Plaintiff's other claims regarding the conditions of his SHU

cell before deciding whether his particular placement in a cell he deems overcrowded is unconstitutional.

First, as to Plaintiff's claims regarding the cleanliness in his cell, the court recognizes that inmates do have a right to a minimal level of cleanliness within their cells. *Peterkin v. Jeffes*, 661 F. Supp. 895, 1027 (E.D. Pa. 1987). Here, however, with respect to his dirty cell with paint peeling and a clogged toilet, Plaintiff has produced no evidence that any of these conditions in his cell jeopardized, or potentially jeopardized, his health, or caused the cell to be unfit for habitation. To the extent that Plaintiff is alleging discomfort in his cell from these conditions, he does not meet the requirements for a claim of cruel and unusual punishment.

Plaintiff also complains that his cell is infested with cockroaches and mice. "A prolonged pest infestation, specifically a significant infestation of cockroaches and mice, may be considered a deprivation sufficient to constitute" a constitutional violation. *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008). In this case, beyond Plaintiff's blanket statement, he has not presented any evidence to establish that an infestation was sufficiently serious to violate the Eighth Amendment. *See Tucker v. Rose*, 955 F.Supp. 810, 816 (N.D. Ohio 1997) (the "occasional presence of a rodent is insufficient to establish the objective component of an Eighth Amendment claim, which requires that a deprivation be

sufficiently serious"). Although Plaintiff presumably suffered discomfort by virtue of the presence of cockroaches and mice, he has not shown that he faces a "substantial risk of serious harm" that has been disregarded by prison officials. *See Hill v. Smith*, No. 4:05-CV-1724, 2005 WL 2666597, at *7 (M.D. Pa. Oct. 19, 2005) (the "presence of mice and cockroaches [in USP Lewisburg cell] does not appear to present a health hazard in this case").

Plaintiff also complains about the heat in the cell. Inmates "have a right to adequate ventilation and a right to be free from extreme heat and cold temperatures[,] . . . [b]ut the Constitution does not give inmates the right to be free from all discomfort." *Shelby Cnty. Jail Inmates v. Westlake*, 798 F.2d 1085, 1087 (7th Cir. 1986). Here, Plaintiff has not presented evidence about the number of days he was subjected to excessive heat and, aside from asserting that he felt thirsty and dehydrated, he has not pointed to evidence that he suffered any significant harm from the heat.

Plaintiff claims that the light in his SHU cell was left on during the night, causing him to have trouble sleeping. It has been recognized that "continuous exposure to low wattage night time security lighting may be permissible based on legitimate security concerns." *Sims v. Piazza*, No. 3:09-CV-0033, 2009 WL 3147800, at *23 (M.D. Pa. Sept. 28, 2009); *see also Jackson v. Beard*, Civ. No. 3:09-CV-2129, 2015 WL 1321721, at *17 (M.D. Pa. Mar. 24, 2015) (blinking

security light in SMU cell is not an Eighth Amendment violation). This court has also concluded that the presence of a 15-watt security night light in a prisoner's cell was necessary for night time institutional security and thus did not give rise to a constitutional violation. *Brown v. Martinez*, Civ. No. 3:03-CV-2392, 2007 WL 2225842, at *8 (M.D. Pa. July 31, 2007). However, requiring inmates to live in constant illumination may under certain circumstances rise to the level of a constitutional violation. *Bacon v. Minner*, 229 F. App'x 96, 100 3d Cir. 2007). In this case, Plaintiff's assertion that he was subjected to constant illumination for an unspecified period of time, without more such as a description of the type of illumination, does not rise to the level of a constitutional violation. *See Daniels v. Pitkins*, Civ. No. 3:14-CV-2383, 2017 WL 890090, at * 6 (M.D. Pa. Mar. 6, 2017) (claim that prisoner was subject to constant lighting in a dry cell for 8 days does not set forth a viable constitutional claim).

Plaintiff claims that Defendant Crawley denied him a shower on two occasions while he was housed in the SHU. The Eighth Amendment does not require that prisoners be afforded frequent or comfortable showers. *See Veteto v. Miller*, 829 F. Supp. 1486, 1496 (M.D. Pa. 1992) (deprivation of showers during period of placement in administrative detention found not to be Eighth Amendment violation); *Jackson v. Beard*, Civ. No. 3:09-CV-2129, 2015 WL 1321721, at *17 (M.D. Pa. Mar. 24, 2015) (occasional shower restrictions is not a viable

constitutional violation); *Briggs v. Heidlebaugh*, No. Civ. A. 96-3884, 1997 WL 318081, at *3 (E.D. Pa. May 21, 1997) (denial of showers for two weeks is not a constitutional violation). Accordingly, Plaintiff's assertion that Defendant Crawley denied him a shower on two occasions does not rise to the level of a constitutional violation.

Plaintiff claims that he was provided with no recreation while housed in the SHU. Recreation is "extremely important to the psychological and physical well-being of the inmates." *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979); *Peterkin v. Jeffes*, 855 F.2d 1021, 1031 (3d Cir. 1988); *see Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996) ("[d]eprivation of outdoor exercise violates the Eighth Amendment rights of inmate confined to continuous and long-term segregation"); *Patterson v. Mintzes*, 717 F.2d 284, 289 (6th Cir. 1983); *Loe v. Wilkinson*, 604 F. Supp. 130, 135 (M.D. Pa. 1984). Although exercise is "one of the basic human necessities protected by the Eighth Amendment," *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993), a temporary denial of exercise with no medical effects is not substantial deprivation. *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (determining that the denial of recreation for twenty-one days was insufficient to sustain an Eighth Amendment claim); *Knight v. Armontrout*, 878 F.2d 1093, 1096 (8th Cir. 1989) (finding that the denial of recreation for thirteen days does not amount to cruel and unusual punishment); *French v. Owens*, 777 F.2d 1250, 1255

(7th Cir. 1985) (pointing out that lack of exercise may rise to a constitutional violation only if the deprivation is such that "movement is denied [to such extent that] muscles are allowed to atrophy [and] the health of the individual is threatened"). Here, Plaintiff asserts that he received no recreation while housed in Lewisburg's SHU for ninety-one (91) days. Aside from this bald assertion, however, Plaintiff has presented no evidence that he suffered any adverse medical effects from the alleged deprivation of recreation. For example, there is nothing in the record to suggest that Plaintiff had atrophy of muscles or other evidence of physical harm that can be attributed to the lack of exercise. Consequently, without more, Plaintiff's claim regarding recreation cannot proceed.

In sum, as set forth above, the Constitution "does not mandate comfortable prisons," *Rhodes*, 452 U.S. at 349. Without any evidence of actual harm to Plaintiff caused by these conditions discussed above, the court concludes that Plaintiff has not demonstrated the existence of a serious constitutional deprivation redressable under *Farmer*. Moreover, for that matter, on summary judgment Plaintiff has not provided any evidence to support his allegations that the Defendants disregarded the substantial risk of serious harm to Plaintiff by failing to take reasonable measures to abate it or that they acted with deliberate indifference to Plaintiff's health or safety. *See Beers-Capitol*, 256 F.3d at 132 (confirming to survive summary judgment in a prison conditions case, a plaintiff "must come

forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm.") (quoting *Farmer*, 511 U.S. at 846). Absent any evidence that the alleged conditions in the SHU cell caused harm to Plaintiff, and that Defendants were deliberately indifferent to that harm, the court concludes that Plaintiff's particular placement in the three-man SHU cell does not violate the Constitution. The court will grant summary judgment in favor of Defendants with respect to all these issues.

### E.  Access to the Courts

Plaintiff claims that he was denied access to the courts not only when he was not permitted to go to the law library while housed in the SHU, but also when he made the telephone call to his brother to discuss obtaining legal services for a lawsuit relating to the alleged assault by Defendant Potter on August 11, 2012. Prisoners enjoy a constitutional right of meaningful access to the law libraries, legal materials, or legal services. *Bounds v. Smith*, 430 U.S. 817, 821-25 (1977). Inmates have a right to send and receive legal mail which is uncontroverted and implicates both First and Sixth Amendment concerns, through the right to petition the government and the right of access to the courts. "When legal mail is read by prison employees, the risk is of a 'chill,' rendering the prisoner unwilling or unable

to raise substantial legal issues critical of the prison or prison employees." *Proudfoot v. Williams*, 803 F. Supp. 1048, 1052 (E.D. Pa. 1992). Such reasoning with respect to legal mail is also applicable to Plaintiff's allegations surrounding the telephone call to his brother.

The Supreme Court in *Lewis v. Casey*, 518 U.S. 343, 351-54 (1996), clarified that an inmate plaintiff, in order to set forth a viable claim under *Bounds*, must demonstrate that a non-frivolous legal claim had been frustrated or was being impeded. A plaintiff must also allege an actual injury to his litigation efforts. Under the standards mandated by *Lewis*, in order for an inmate to state a claim for interference with his legal work, he must demonstrate that he has suffered actual injury. *See Oliver v. Fauver*, 118 F.3d 175, 177-78 (3d Cir. 1997) (concluding that *Lewis* effectively requires a showing of actual injury where interference with legal mail is alleged).

Here, Plaintiff alleges that he was not taken to the law library and that prison officials heard him discussing filing a lawsuit with his brother on the telephone. However, no actual injury to Plaintiff's ability to present a non-frivolous, arguable claim can be identified in his amended complaint or filings in response to Defendants' motions. Applying *Lewis* to the undisputed facts, summary judgment will be granted in favor of Defendants.

## F.  Retaliation

Plaintiff contends that his transfer to the SHU after the August 11, 2012 incident was ordered in retaliation because he filed a grievance and was preparing to file a lawsuit related to the incident.  Plaintiff also contends that he faced retaliation once he entered the SHU.  The court has already dismissed the claim relating to the decision to transfer Plaintiff to the SHU against Defendants Knapp and Eichner for failure to establish personal involvement.  (*See* Part III.A.2, at 19-20.)  The remaining Defendants argue that: (1) Defendants Thomas, McClintock, Crawley, and Potter had no personal involvement in the decision to transfer Plaintiff to the SHU, and (2) Defendant Fosnot's involvement in Plaintiff's placement in the SHU "began and ended with his investigation in good faith to resolve the Plaintiff's grievances."  (Doc. 236 at 17.)  All Defendants also argue that none of their conduct in the SHU complained of by Plaintiff demonstrates retaliation.

The First Amendment offers protection for a wide variety of expressive activities.  *See* U.S. Const. amend. I.  These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct.  *See Turner v. Safley*, 482 U.S. 78, 89 (1987).  Retaliation for expressive activities can infringe upon an individual's rights under the First Amendment.  *See Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000).  To prevail on a retaliation claim, a plaintiff

bears the burden of satisfying three (3) elements. Initially, a plaintiff must prove that he was engaged in a constitutionally protected activity. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). In this case, Plaintiff argues he was subject to retaliation because he filed an administrative grievance and spoke to his brother about filing a lawsuit, both related to the August 11, 2012 incident. The filing of an administrative grievance and a lawsuit is constitutionally protected conduct. *See Mitchell v. Horn*, 318 F.3d 523, 430 (3d Cir. 2003); *Allah*, 229 F.3d at 224. All Defendants concede that Plaintiff engaged in constitutionally protected conduct. Therefore, Plaintiff has met the first element of a retaliation claim.

Next, a prisoner must demonstrate that he "suffered some 'adverse action' at the hands of prison officials." *Rauser*, 241 F.3d at 333 (quoting *Allah*, 229 F.3d at 225)). This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his [constitutional] rights." *Id*. (quoting *Suppon v. Dadonna*, 203 F.3d 223, 235 (3d Cir. 2000). The retaliatory act may be actionable even though the act, standing alone, does not transgress the constitution. *Allah*, 229 F.3d at 224. Moreover, the test for adverse action is objective, not subjective, and whether the plaintiff was actually deterred by the defendant's retaliatory acts is not dispositive. *See Citizens for a Better Lawnside, Inc. v. Bryant*, Civ. No. 05-4286(RBK), 2007 WL 1557479, at *5-6 (D.N.J. May 24, 2007). Stated differently, the defendant does not escape liability simply because his retaliatory acts failed to deter the plaintiff from

exercising constitutional rights. The proper focus is whether a person of "ordinary firmness" would have been deterred. *See Brooks v. Smith*, Civ. No. 3:04-CV-2680, 2007 WL 3275266, at *9 (M.D. Pa. Nov. 6, 2007) (discussing prisoner's claim for retaliatory placement in SHU).

If the prisoner satisfies the first two elements, he must then prove a causal link between his constitutionally protected conduct and the adverse action. *Rauser*, 241 F.3d at 333. First, the plaintiff must prove his constitutionally protected conduct was "a substantial or motivating factor" for the adverse action. *Id*. (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). To show a causal connection, a plaintiff must prove "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. Deflaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

Once a plaintiff has made a *prima facie* case, the burden shifts to the defendants to prove by a preponderance of the evidence that they "would have made the same decision absent the protected conduct for reasons reasonably related to penological interest." *Carter v. McGrady*, 292 F.3d 152, 158 (3d Cir. 2002) (internal quotation and citation omitted). When analyzing a retaliation claim, it must be recognized that the task of prison administrators and staff is difficult, and

the decisions of prison officials require deference, particularly where prison security is concerned. *Rauser*, 241 F.3d 334.

With these elements in mind, the court will address Plaintiff's two retaliation claims.

### 1. <u>Decision to Transfer Plaintiff to SHU</u>

Turning first to the decision to transfer Plaintiff to the SHU after the August 11, 2012 incident, in support of summary judgment, Defendants Thomas, McClintock, Crawley, and Potter contend that they had no personal involvement in that decision. Upon review of the amended complaint and Plaintiff's brief in opposition to the motion for summary judgment, it is clear that Plaintiff is not making this claim against these Defendants. Moreover, Plaintiff has presented no evidence to demonstrate personal involvement by these Defendants in the decision to place Plaintiff in the SHU after the August 11, 2012. Plaintiff does claim, however, that Defendant Fosnot, the SIS agent in charge of the investigation into the events of August 11, 2012, was the official who ordered Plaintiff's removal to the SHU. (Doc. 105 ¶ 11.) In the motion for summary judgment, Defendant Fosnot asserts that Plaintiff was placed in the SHU in administrative segregation "for his own protection until the incident could be investigated." (Doc. 236 at 5.) He also states, "Defendant Fosnot of the SIS was assigned to the matter and oversaw the investigation. Plaintiff remained in the SHU until his claims went through the administrative process. This process took several months and Plaintiff

was removed from the Lewisburg SHU at its conclusion." (*Id*.)  In opposition, Plaintiff has presented no evidence that Defendant Fosnot placed him in the SHU in administrative segregation for any purpose other than to investigate the August 11, 2012 incident.  In the absence of evidence of personal involvement and retaliatory motive with respect to the decision to transfer Plaintiff to the SHU, summary judgment will be granted in favor of all Defendants.

## 2.  Retaliation in SHU

Plaintiff also asserts that he faced retaliation for seeking legal action related to the August 11, 2012 incident once he was actually in the SHU.  Plaintiff makes this claim against Defendants Thomas, McClintock, Crawley, Fosnot, and Potter.  All Defendants deny Plaintiff's allegations.  As there appears to be no question that Plaintiff was engaged in the constitutionally protected activity of challenging the legality of Defendant Potter's and others' actions on August 11, 2012, the court will address the remaining elements of this retaliation claim in turn.

### a.  Adverse Action

Plaintiff contends that he suffered adverse action in the form of the verbal harassment and his conditions of confinement which, as he terms it, constituted a "campaign of harassment."  As to verbal abuse, Plaintiff claims that various Defendants made statements to him such as, "It sucks to be you now," (Doc. 105 ¶ 35); "Potter will see you soon," (*id*. ¶ 36); "this is your new home for the next 18 months, (*id*. ¶38); "suck it up, and next time don't come to the SHU," (*id*. ¶ 48);

and, "If you were at Camp you would not have to put up with being handcuffed and shackled," (*id.* ¶ 53).

General verbal harassment and antagonizing have been found not to constitute an actionable adverse action. *See Marten v. Hunt*, 479 F. App'x 436 (3d Cir. 2012); *Dickerson v. Gordon*, Civ. No. 1:13-CV-1993, 2015 WL 5785575, at *6 (M.D. Pa. Sept. 30, 2015). Furthermore, taken together with Plaintiff's other allegations above relating to the conditions of the SHU, the allegations of verbal abuse do not establish adverse action by all Defendants "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights." *Rauser*, 241 F.3d at 333 (quoting *Suppon*, 203 F.3d at 235). Plaintiff has presented no evidence beyond bald allegations that Defendants Thomas, McClintock, Crawley, and Fosnot subjected him to these actions, ranging from conditions in his cell to verbal statements made by corrections officers, in retaliation for his seeking legal action related to the August 11, 2012 incident. With that said, the court also finds that Plaintiff has also failed here to establish the causal link between the exercise of his constitutional rights and the adverse action taken against him.

What is more troubling for the court is Plaintiff's contention that he suffered adverse action in the form of the forced interaction with Defendant Potter himself in the SHU mere days after August 11, 2012, as well as for the weeks following the incident. According to Plaintiff, Defendant Potter was either

45

directing, or performing himself, the dispensing of necessary medication such as insulin to Plaintiff in the SHU. While at first Potter hid his presence from Plaintiff behind the cell door when Plaintiff was receiving his medication, once Plaintiff discovered Potter was on the unit, Potter did nothing to hide the fact the he himself was treating Plaintiff. Plaintiff directs the court to no less than fifteen (15) occasions that Defendant Potter came to his SHU cell to administer medication, and with each occasion, Potter referred to Plaintiff as an "a\*\* hole." This interaction caused great distress to Plaintiff, including extreme headaches and a fear of taking the insulin he presumably believed was somehow tainted by Defendant Potter.[11] Defendant Potter presents no evidence to refute Plaintiff's allegations that he was allowed to administer medication to Plaintiff in the SHU after the incident and that he undertook a "campaign of harassment" against Plaintiff in the SHU in retaliation for Plaintiff's efforts to bring legal action against him. Rather, he insists that he had no personal involvement in this claim. As such, the court finds the presence of disputed facts which should be resolved by a jury and not this court on summary judgment. Further, in light of this factual dispute

---

[11] Plaintiff alleges that, once he discovered Defendant Potter was preparing his insulin syringes, he would pretend to inject himself and instead empty the contents into the air, out of a fear for his life. (Doc. 105 ¶ 43.) The court notes, too, that Plaintiff makes a similar allegation against Defendant McClintock, but beyond simply stating that he did not trust McClintock and "feared harm," he asserts no injury as a result of his interaction with McClintock. (*See id.* ¶ 36-39.) Without more, the court is not willing to extend the retaliation claim to Defendant McClintock.

related to adverse action, the court will also send to a jury the question of whether Plaintiff has established a causal connection.

In sum, the court will grant summary judgment in favor of Defendants Thomas, McClintock, Crawley, and Fosnot with respect to this retaliation claim. The court will allow the claim of retaliation to go forward against Defendant Potter.

## G. **Due Process**

Plaintiff also raises a vague claim that his due process rights were violated when Defendant Fosnot ordered his placement in the SHU and denied Plaintiff a satisfactory review of his claims of abuse. Defendant Fosnot counters that the only reason Plaintiff was placed in the SHU was placement in administrative segregation is required for a prisoner's safety while his claims of abuse are being investigated. Upon consideration, the court will deny this claim.

The Fourteenth Amendment prohibits the states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In order to determine whether a due process violation has occurred, an initial determination must be made that a protected liberty interest exists and, if so, the next step is to define what process is mandated to protect it. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995). A protected liberty interest may be created by either the Due Process Clause itself or by state law. *Id*. Due process

requirements apply only when the prison officials' actions impose "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. at 484. Conversely, there can be no due process violation where there is no protected liberty interest.

The Third Circuit in *Griffin v. Vaughn*, 112 F.3d 703 (3d Cir. 1997), addressed an action initiated by a Pennsylvania state inmate who had been held in administrative custody for a prolonged period. The Court applied *Sandin* and concluded that placement without any type of due process hearing for a period of fifteen (15) months was not an atypical and significant hardship. Furthermore, the inmate's "commitment to and confinement in administrative custody did not deprive him of a liberty interest and that he was not entitled to procedural due process protection." *Id*. at 708. Finally, an inmate placed in administrative custody pursuant to a legitimate penological reason could "be required to remain there as long as that need continues." *Id*.

Pursuant to these standards developed in *Sandin* and *Griffin*, this court finds that the amended complaint fails to set forth a due process violation in relation to Plaintiff's 165-day term of administrative custody in the SHU, both at USP-Lewisburg and USP-Allenwood. This determination is bolstered by Defendant Fosnot's statement regarding Plaintiff's administrative custody:

> [B]efore I conduct any investigation on a complaint alleging physical abuse I must first forward it to OIA for their review who then

> forwards it to the office of OIG and then forward[s it] to the Civil
> Rights Division for review and possible investigation. It is then
> referred back down the chain from the Civil Rights Division to OIG
> and OIA to myself and only at that time do I conduct an investigation.
> In my experience this process usually take much longer than 70 days
> and can take as long as a year.

(Doc. 237 at 11.) Plaintiff has presented no evidence to counter Defendant

Fosnot's assertions relating to the process of investigation and the need for

prolonged administrative custody. Rather, Defendant Fosnot has established a

legitimate basis for Plaintiff's administrative custody.

Since Plaintiff has failed to sufficiently allege that he was subjected to

administrative placement in the SHU which constituted an atypical and significant

hardship as required under *Sandin*, the request for summary judgment with respect

to a due process claim will be granted.

## IV. <u>Conclusion</u>

For the reasons set forth herein, the motions for summary judgment will

be granted as to Defendants Thomas, Crawley, McClintock, and Fosnot. Further,

the motion for summary judgment will be denied with respect to Defendants

Potter, Eichner, and Knapp, and the matter will proceed to trial.

An appropriate order will issue.

                                          s/Sylvia H. Rambo
                                          SYLVIA H. RAMBO
                                          United States District Judge

Dated: March 6, 2018